[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-10292
_____

D.C. Docket No. 99-00834-CV-KMM

TELECOM ITALIA, SPA,

Plaintiff-Counter-Defendant,

versus

WHOLESALE TELECOM CORPORATION,

Defendant-Counter-Claimant-
Third-Party-Plaintiff-Appellee,

TELEMEDIA INTERNATIONAL U.S.A., INC.,

Third-Party-Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 18, 2001)**

Before EDMONDSON, FAY and NEWMAN*, Circuit Judges.

_____

*Honorable Jon O. Newman, U.S. Court of Appeals for the Second Circuit, sitting by designation.

NEWMAN, Circuit Judge:

This interlocutory appeal concerns the arbitrability of a tort claim alleged to be related to a contract containing an arbitration clause. Telemedia International U.S.A., Inc. appeals from the order of the District Court for the Southern District of Florida (K. Michael Moore, District Judge), denying its motion to dismiss or alternatively to stay proceedings pending arbitration. We agree that arbitration was not required, and we therefore affirm.

## Background

### I. Facts

The three actors in this case are (1) Telecom Italia, SpA ("Telecom Italia"), (2) Appellant Telemedia International U.S.A., Inc. ("TMI"), a Florida corporation, which is a wholly-owned subsidiary of Telecom Italia, and (3) Appellee Wholesale Telecom Corp. ("WTC"). Telecom Italia and TMI operate telecommunications networks internationally and in the United States, respectively; WTC is a reseller of telecommunications services.

WTC, the party asserting the tort claim at issue, alleged in a third-party complaint the following facts, which we assume are true for purposes of this appeal. Beginning in July 1998, Telecom Italia began routing calls on behalf of WTC under an oral agreement. In September 1998, Telecom Italia and WTC discussed an

expanded, more formal arrangement, whereby WTC would pay market rates to Telecom Italia to route calls through Telecom Italia's switch in Rome to any place in the world, and WTC would invest in expensive switching equipment to process more call volume from the United States. Telecom Italia was supposed to draw up a contract based on a written contract Telecom Italia had executed with another reseller. Instead, Telecom Italia sent WTC an agreement in October 1998 that was materially different in several respects from the template agreed to in September. WTC objected to these differences and did not sign the altered agreement.

Telecom Italia is not legally authorized to transport calls in the United States, and during the September negotiations Telecom Italia pressured WTC to lease circuits from TMI, the United States subsidiary of Telecom Italia, to get the calls from the United States to Rome. In October 1998, TMI and WTC executed a written lease of TMI's circuits for a substantial rental. The lease provides: "In the event of any dispute arising out of or relating to this service agreement, the dispute shall be submitted to and settled by arbitration in the City of New York, in accordance with the rules of the American Arbitration Association." Leases for additional circuits were signed in the next few months.

Meanwhile, notwithstanding the apparent absence of a formal, written agreement between Telecom Italia and WTC, Telecom Italia continued to provide

telecommunications services to WTC from July 1998 to March 1999, and WTC made a number of costly investments in equipment and marketing on the assumption that Telecom Italia would honor the terms that were allegedly agreed to at the September 1998 meeting. WTC further alleged that during this period, the quality of service provided by Telecom Italia was seriously below the levels agreed to at the September meeting.

Telecom Italia began sending invoices to WTC in January 1999. WTC claims that these invoices were the opening salvo in a joint effort by TMI and Telecom Italia to get rid of WTC. The first invoice arrived just after a meeting between TMI and WTC, in which TMI allegedly urged WTC to terminate WTC's agreement with Telecom Italia, so that TMI could replace WTC in marketing international long distances services. Moreover, WTC alleged that the first invoice charged rates that were grossly in excess of the rates agreed to in September 1998. Telecom Italia eventually sent invoices seeking a total of more than $13 million from the period July 1998 and March 1999. Acting on its theory that the rates were grossly inflated, WTC paid only what it considered were the undisputed parts of the invoices (several hundred thousand dollars, at most).

In February 1999, Telecom Italia responded by terminating WTC's use of two of the three TMI circuits needed to route calls to Rome. In March, Telecom Italia

terminated WTC's use of the last TMI circuit, effectively shutting WTC down. Telecom Italia had been WTC's sole provider of telephone services.

II. Procedural History

In March 1999, Telecom Italia filed a complaint against WTC in the District Court, alleging breach of contract, based on WTC's failure to pay Telecom Italia's $13 million worth of invoices for calls made between July 1998 and March 1999. In August 1999, WTC answered Telecom Italia's complaint, and counterclaimed against Telecom Italia. The counterclaim alleged the events described above: the oral agreement in place in summer 1998, the September 1998 "agreement" that was never successfully executed, the large investments by WTC in reliance on the September agreement, and finally the written, fully executed leases with TMI, entered into at Telecom Italia's insistence. The counterclaim alleged that Telecom Italia breached the price, quality, and prompt invoicing terms of the September agreement. The counterclaim also alleged that Telecom Italia caused TMI to increase the rate for use of its circuits, and that Telecom Italia caused its subsidiary, TMI, to terminate WTC's access to the TMI circuits in March 1999. The counterclaim alleged breach of contract, "fraud in the inducement," and a "conspiracy" between Telecom Italia and TMI to put WTC out of business.

In September 1999, WTC filed a third-party complaint against TMI, alleging

two causes of action--tortious interference with contract and civil conspiracy. The third-party complaint alleges that TMI tortiously interfered with WTC's contract with Telecom Italia. The basic accusation was that TMI and Telecom Italia had colluded to blind-side WTC with demands for payments in unexpected amounts, so as to induce WTC to abandon or breach its contract with Telecom Italia, and to enable TMI to sell long-distance services directly to the market that WTC had invested so much to develop. These unexpectedly onerous demands for payment were included in the TMI-WTC contract itself, in conditions later added to the contractual arrangement, and in Telecom Italia's grossly excessive and delayed invoices to WTC. Specifically, TMI allegedly took the following actions with Telecom Italia's knowledge and support, all in an attempt to drive WTC away from its contract with Telecom Italia:

- Under the circuit lease, TMI charged grossly excessive rates for use of TMI circuits, taking advantage of an earlier agreement between WTC and Telecom Italia that allegedly permitted TMI to set its rates unilaterally.

- TMI demanded payment of an onerous security deposit to TMI after the first circuit had already been activated. The intent of these excessive rate and security deposit demands was "to make WTC's performance of its contract with Telecom Italia expensive and burdensome, and with the intent to cause WTC to be forced to withdraw from its contractual relationship with Telecom Italia." It is unclear whether this security deposit is actually part of the express terms of the circuit contract.

- "Telecom Italia, acting in concert with TMI, wrongfully terminated WTC's access" to the TMI circuits in February and March 1999.

- TMI persuaded Telecom Italia to delay in the submission of invoices to

WTC, and to inflate those invoices, so as to shock WTC and persuade WTC to abandon its contract with Telecom Italia. Telecom Italia allegedly sent its first invoice to WTC immediately after a January 1999 meeting between TMI and WTC, at which TMI urged WTC to withdraw from its contract with Telecom Italia, so that TMI could take WTC's place.

TMI moved to dismiss the third-party complaint on the ground that WTC failed to state a claim, or alternatively to stay proceedings pending arbitration because the circuit lease contract between TMI and WTC required arbitration of all disputes "arising out of or relating to this service agreement." The District Court granted the motion to dismiss in part. Judge Moore ruled that the third-party complaint failed to state a claim for civil conspiracy on which relief could be granted, but upheld the sufficiency of the tortious interference claim. He further ruled that the third-party complaint was not subject to the arbitration clause in the TMI-WTC contract, because the allegations concerned tortious interference with the Telecom Italia-WTC contract, which lacked an arbitration clause:

> On its face, the Third-Party Complaint would appear to arise from the contract between TMI and WTC, thus potentially subjecting the claims for tortious interference and conspiracy to arbitration under the [Federal Arbitration Act]. However, as alleged, the claims set forth within the Third-Party Complaint do not involve directly the contract between TMI and WTC. Rather, the claims are based on allegations of tortious interference and conspiracy relating to the disruption of a separate contract – specifically that between WTC and Telecom Italia. WTC has not alleged a claim for breach of contract by TMI.
>
> Furthermore, because of the close relationship between the facts

and claims at issue in the litigation currently proceeding between Telecom Italia and WTC, the interests of judicial economy would seem to be served best through the adjudication of WTC's third-party complaint by this Court.

TMI filed a notice of appeal and has asserted interlocutory appellate jurisdiction under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a)(1)(A). WTC moved to dismiss the appeal, contending that there was no appellate jurisdiction. A panel of this Court ordered additional briefing on jurisdiction, and referred the jurisdictional inquiry to this panel.

Discussion

I. Jurisdiction

Under 9 U.S.C. § 16(a)(1)(A), an appeal may be taken from an order "refusing a stay of any action under section 3 of this title." In turn, 9 U.S.C. § 3 provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had.

In this case, TMI's motion in the District Court sought dismissal of the complaint to allow arbitration to proceed, and alternatively sought a stay pending arbitration. Denial of the alternative relief was appealable under section 16(a)(1)(A). See Paladino v. Avnet Computer Technologies, Inc., 134 F.3d 1054, 1056 (11th Cir.

-8-

1998).  WTC resists the assertion of appellate jurisdiction on the ground that the District Court ruled that the arbitration clause of the WTC-TMI contract was not applicable to WTC's tortious interference claim.  That argument is unavailing because it confuses the reason for the District Court's ruling against arbitration with the appealability of the ruling.  Whether or not the District Court was correct in ruling against arbitration, its ruling denied a requested stay of the action pending arbitration and was for that reason appealable.

II. Merits of the Denial of Arbitration

Absent some violation of public policy, a federal court must refer to arbitration any controversies covered by the provisions of an arbitration clause.  Chastain v. Robinson-Humphrey Co., 957 F.2d 851, 854 (11th Cir. 1992).  Whether a party has agreed to arbitrate an issue is a matter of contract interpretation:  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).

The arbitration clause relied on by WTC calls for arbitration of "any disputes arising out of or relating to" the lease between WTC and TMI.  Although this language is broad, it is not as broad as a clause requiring arbitration of "any dispute between them or claim by either [party to the contract] against the other."  Brown v.

ITT Consumer Financing Corp., 211 F.3d 1217, 1221 (11th Cir. 2000). The "arising out of or relating to" language has proved especially problematic in cases like the pending one where the dispute concerns a tort (TMI's alleged tortious interference with the contract between WTC and Telecom Italia) alleged to be "related to" a contract with an arbitration clause (the WTC-TMI lease). One commentator has noted:

> The first bar to arbitrability is based on the notion that parties to an arbitration agreement should be compelled to arbitrate only those torts contemplated by the arbitration agreement. Unfortunately, the standard arbitration clause found in most commercial contracts broadly states that "any controversy or claim arising out of, or relating to this agreement, or the breach thereof[,]" shall be settled by arbitration. If one party commits a tort against the other, the inevitable question is whether this broad, general language of the arbitration agreement is sufficient to encompass tort claims. The longstanding rule is that where the arbitration clause is broad, the tort claim will be arbitrable if the claim is either directly or indirectly related to the subject matter of the contract.

Joseph T. McLaughlin, Arbitrability: Current Trends in the United States, 59 Alb. L. Rev. 905, 932 (1996) (emphasis added) (footnotes omitted). The question remains: when is a dispute "related to" the "subject matter" of the contract?

The case law yields no clear answer. We have required arbitration where the tort could not have occurred but for a breach of contract. In Gregory v. Electro-Mechanical Corp., 83 F.3d 382 (11th Cir. 1996), the plaintiff claimed that the defendant induced the plaintiff to enter into a contract that the defendant had no

intention of honoring; we required arbitration of the fraud tort claim as related to the contract on the theory that the tort claim would never have arisen had the defendant honored the contract. In McBro Planning and Development Co. v. Triangle Electrical Construction Co., 741 F.2d 342, 344 (11th Cir. 1984), two contractors each had a contract with a hospital, but there was no contract between the contractors themselves. Each hospital contract contained an arbitration clause, and each mentioned that one contractor would supervise the other contractor. The supervised contractor claimed that the supervising contractor harassed him to such an extent that he could not fulfill his contract. We held that this dispute was covered by the arbitration clause in both contractors' agreements with the hospital, see id. at 344, on the theory that the tort was "founded in and intertwined with" the obligations of the hospital contracts. Id. at 344 (internal quotation marks omitted).

In other cases, however, we have rejected claims that an arbitration clause in a contract covered a dispute concerning another contract claim or a tort claim, each of which was claimed to be related to the contract requiring arbitration. In Seaboard Coast Line Railroad Co. v. Trailer Train Co., 690 F.2d 1343 (11th Cir. 1982), the parties had a contract to lease railcars and a contract to license railcars; only the license contract had an arbitration clause. The Plaintiff claimed that the defendant breached the lease contract by failing to submit tax documents verifying certain leases.

The defendant argued that any "furnishing" of a railcar was covered by the license contract and its arbitration clause. We rejected this broad reading of the license contract and denied arbitration on the ground that the two contracts were "separate and distinct." Id. at 1351. In Texaco, Inc. v. American Trading Transportation Co., 644 F.2d 1152 (5th Cir. Unit A 1981), the contract with the arbitration clause was a ship charter; negligent piloting and the ship's unseaworthiness allegedly caused damage to the party chartering the ship. The Court rejected arbitration of the ensuing tort claim on the ground that the "complaint at bar is not the result of a difference or dispute arising out of the Charter." Id. at 1154. However, in both Texaco and Seaboard, the arbitration clause had "arising out of" or "arising under" language, but did not include "or related to" language.[1]

---

[1]Other circuits have grappled with the problem in the context of a joint venture arrangement (with an "arising out of or related to" arbitration clause), which one party circumvents by hiring away the other party's key employees; the injured party claims tortious interference with the employment contracts, and the defendant invokes the arbitration clause of the joint venture agreement. Some courts rule that in such a situation the tortious interference claim arises out of or is related to the joint venture agreement. See Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 910 (7th Cir. 1999) (contracts related because the alleged tortfeasor had insisted that the employee in question work on the joint venture as a prerequisite to entry into the joint venture agreement); American Recovery v. Computerized Thermal Imaging, 96 F.3d 88, 94 (4th Cir. 1996) (employee in question had duties under the joint venture agreement; interfering with his employment contract was therefore related to the joint venture agreement); cf. Sweet Dreams Unlimited v. Dial-A-Mattress International, 1 F.3d 639, 642 (7th Cir. 1993) (tortious interference with plaintiff's other business relationships covered by arbitration clause, because disputes had their "genesis" in the original licensing agreement). However, the Second Circuit has rejected arbitration in these circumstances on the theory that the employment contract and the joint venture agreement are distinct from one another. See Collins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16, 22 (2d Cir. 1995) (distribution agreement was not related to tortious interference in employment contracts of key employees); Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987)

It is possible to harmonize the results in these four cases by focusing on whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties. Disputes that are not related--with at least some directness--to performance of duties specified by the contract do not count as disputes "arising out of" the contract, and are not covered by the standard arbitration clause. Thus in Texaco, Texaco had no right under its charter with American Trading to obtain safe operation of the chartered vessel; in Seaboard, Seaboard had no right under its license contract (the one with the arbitration clause) to obtain the documentation it was demanding under the lease contract (the one without the arbitration clause). However, where the dispute occurs as a fairly direct result of the performance of contractual duties--as was the case with the supervisor's harassment of the other contractor in McBro, or with the intentional failure to perform the contract in Gregory, then the dispute can fairly be said to arise out of or relate to the contract in question, and arbitration is required.

With this approach in mind, we conclude, in agreement with the District Court, that WTC's tortious interference claim neither arises out of nor is related to WTC's lease with TMI. WTC alleged that TMI pressured Telecom Italia to induce Telecom

---

(tortious interference claim based on bribe of executive of contracting party not arbitrable because not "on its face" related to sales contract).

Italia to use its rates and billing practices to destroy WTC. Even if TMI can be shown at trial to have tortiously interfered with Telecom Italia's contract with WTC, there is no claim that TMI's performance of its contract with WTC was designed to, expected to, or likely to exert any pressure on Telecom Italia, unlike the harassment in McBro, which occurred as a result of the performance of a contractual duty. TMI's alleged pressure could have been exerted on Telecom Italia even if TMI had no contractual relationship with WTC.

TMI contends that the requisite relationship between the interference tort and the WTC-TMI contract is shown by the allegations of WTC's third-party complaint that TMI charged WTC excessive lease rates, demanded unjustified security deposits, and wrongfully terminated the circuit leases. Although these claims, if alleged as causes of action, would plainly be arbitrable as "related to" the WTC-TMI contract, their recitation in support of the claim that TMI interfered with WTC's contract with Telecom Italia does not suffice to make the interference claim arbitrable.

At most, TMI's allegedly unfair contract terms would show only that TMI was hostile to WTC and perhaps had a motive to influence Telecom Italia to injure WTC. But if a tort claim were arbitrable simply because terms in a contract with an arbitration clause were sufficiently harsh to show one party's motive to injure the other party, the scope of arbitration would extend far beyond the reasonable expectation of

-14-

the contracting parties. On this theory, for example, an animus evidenced by harsh terms in a contract (with an arbitration clause) between two parties would render arbitrable an antitrust claim by one contracting party that the other party had joined with other companies in an unreasonable agreement in restraint of trade to injure the claimant. Arbitrability of the tortious interference claim is not required simply because some of TMI's contract terms were unfavorable to WTC.

In affirming the District Court's judgment, we decline to endorse its suggestion that arbitration is not appropriate in this case because it would inefficiently result in bifurcated proceedings. If otherwise required, arbitration must be ordered "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." Dean Witter Reynolds v. Byrd, 470 U.S. 213, 217 (1985). We regard the District Court's comment about judicial economy as an aside that was unnecessary to its correct ruling.

Conclusion

The order of the District Court denying arbitration is AFFIRMED.