[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 14, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10284

_____

D. C. Docket No. 06-80966-CV-DTKH

INTERNATIONAL UNDERWRITERS AG
& LIBERTY RE-INSURANCE CORPORATION, S.A.,

Plaintiff-Counter-Defendant-Appellant,

versus

TRIPLE I: INTERNATIONAL INVESTMENTS, INC.,

Defendant-Counterclaimant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 14, 2008)**

Before BIRCH and FAY, Circuit Judges, and HINKLE,* District Judge.

HINKLE, District Judge:

_____
        *Honorable Robert L. Hinkle, United States District Chief Judge for the Northern District
of Florida, sitting by designation.

This appeal raises the issue of the arbitrability of specific claims arising from a commercial venture gone bad. The object of the venture was the construction of a cement plant in Nigeria. The parties to this appeal are the owner who proposed to build the plant and the surety who agreed to issue a financial guarantee bond as collateral for a loan that would fund the project. The owner asserts the proposed loan was a sham. The owner sued the surety (and others) for fraud and on other theories. The surety moved to compel arbitration not based on any arbitration clause in its principal agreement with the owner — the agreement said nothing about arbitration — but instead based on an arbitration clause in an escrow agreement through which the bond documents were to be delivered and the surety's fee was to be paid. The district court denied the motion. We affirm.

## I. Facts

Appellee Triple I: International Investments, Inc. ("Triple I") wished to build a cement plant in Nigeria. It needed a $520 million loan. Financial advisors purportedly found a lender (Japan Venture Fund Group ("Japan Venture")) and an issuer of a financial guarantee bond (appellant International Underwriters AG & Liberty Re-Insurance Corporation, S.A. ("International")).

Triple I and International agreed that Triple I would pay International a fee of $10.4 million for issuing the bond and that International would refund all but $200 of the fee if the bond was not used. International confirmed the agreement in

2

its written bond commitment. There was no agreement to arbitrate.

Triple I and International eventually agreed that the $10.4 million fee would be payable half in advance and half after Triple I's receipt of the loan proceeds. The parties intended to close the transactions remotely, not in person. To facilitate that approach, they engaged an escrow agent (W. E. Fielding and Associates ("WEF")) and entered a written escrow agreement. Among the terms were that International would tender to WEF the $5.2 million payable to International in advance, that International would tender to WEF the appropriate bond documents, and that — upon confirmation that Japan Venture had funded the loan — WEF would disburse the $5.2 million to International. The escrow agreement included a clause calling for arbitration of "any dispute arising pursuant to or in any way related to this Agreement or the transactions contemplated hereby." Escrow Agreement, R.1.1.8 ¶12.

Triple I tendered the $5.2 million to WEF. International tendered the bond documents to WEF. Japan Venture never funded the loan, but WEF disbursed the $5.2 million to International. Triple I demanded return of the fee, but International balked. Triple I thus was out $5.2 million.

International filed a lawsuit in which it denied that Triple I was entitled to a refund of the entire $5.2 million but also sought to "interplead" that amount for a determination by the court of the parties' respective rights. Triple I

counterclaimed. In due course International voluntarily dismissed its complaint, and Triple I twice amended its counterclaim. In the second amended counterclaim, Triple I asserted that the whole deal was a sham from the outset. Triple I named 11 counterclaim defendants, including International. Triple I sought recovery against all of the counterclaim defendants for fraud and under the Racketeer Influenced and Corrupt Organizations Act. Triple I also sought recovery against International for breach of the contract for issuance of the financial guarantee bond and on a related theory of promissory estoppel. Triple I expressly did *not* seek recovery against International or the other counterclaim defendants for breach of the escrow agreement:

> By this Second Amended Counterclaim, [Triple I] hereby makes no claim against International or the Additional Counterclaim Defendants for breach of the Escrow Agreement or based upon the escrow transaction contemplated in the Escrow Agreement.

Second Amended Counterclaim, R.1.32.7 ¶35.

International moved to compel arbitration based on the arbitration clause in the escrow agreement. The district court denied the motion. International filed this appeal.

## II. Standard of Review

We review *de novo* a district court's decision on whether a dispute is covered by an arbitration agreement. *See, e.g., Employers Ins. of Wausau v. Bright*

4

*Metal Specialties, Inc.*, 251 F.3d 1316, 1321 (11th Cir. 2001).

### III. Merits

A dispute ordinarily is arbitrable if the parties have agreed to arbitrate it. As we have said:

> Absent some violation of public policy, a federal court must refer to arbitration any controversies covered by the provisions of an arbitration clause. *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir.1992). Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

*Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001). The canons of construction run in favor of arbitration. *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

Triple I and International entered an agreement under which International was to issue a financial guarantee bond and Triple I was to pay International a fee. According to the second amended counterclaim, International never intended to perform; the entire undertaking was a sham. The principal substantive issue between Triple I and International is whether that is so.

If Triple I and International had included an arbitration clause in the

agreement for issuance of the bond — requiring, for example, arbitration of disputes arising from the agreement, or related to the agreement — it would be clear that Triple I's claims against International would be arbitrable. But the agreement for issuance of the bond did not include an arbitration provision. The failure to include any reference to arbitration as part of the parties' primary agreement is substantial evidence of their intent not to require arbitration of claims like those now at issue.

Triple I and International were, however, parties to the separate escrow agreement. The escrow agreement included an arbitration clause. Still, the clause did not purport to require arbitration of disputes that were separate from and unrelated to the escrow arrangement. Instead, as one might expect from the context, the clause said the parties would arbitrate "any dispute arising pursuant to or in any way related to this Agreement [that is, the escrow agreement] or the transactions contemplated hereby."

The escrow agreement addressed the narrow issue of the mechanics for exchanging documents and funds as part of the broader agreement for issuance of a financial guarantee bond. In this context, a dispute "arising pursuant to or in any way related to" the escrow agreement includes a dispute over the terms or performance of the escrow agreement. A dispute arising pursuant to or in any way related to "the transactions contemplated" by the escrow agreement includes a

dispute over the terms or performance of the escrow transactions — the tendering of the documents and funds and their later delivery. Thus when Triple I made a claim against WEF for failure to perform as required by the escrow agreement, WEF was entitled to compel arbitration, as International readily admitted.[1]

But the same is not true of Triple I's claims against International for fraud and for breach of the agreement for issuance of a financial guarantee bond. We assume, for purposes of this appeal, that the fraud and breach occurred as alleged. *See Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1111 (11th Cir. 2001) (assuming that the facts alleged in the relevant pleading were true for purposes of an appeal over arbitrability). Triple I's allegation is that International's undertaking was a sham from the outset. At the outset, and indeed when International issued its bond commitment, there was no escrow agreement. The parties entered the escrow agreement only later, as a means of exchanging the deliverables to which they had separately agreed. The "transactions contemplated" by the escrow agreement did not include an already-underway fraudulent scheme that the perpetrators undoubtedly would have been more than

---

[1] Before filing the second amended counterclaim, Triple I asserted a claim against WEF for breach of the escrow agreement. WEF moved to compel arbitration of that claim, and Triple I immediately agreed to arbitrate. International now says that this judicially estops Triple I from asserting that its claims against International are not arbitrable. But there is nothing inconsistent about Triple I's positions. To the contrary, Triple I's position that the claim against WEF was arbitrable but the claims against International are not is a fully consistent — indeed correct — reading of the contracts at issue.

7

willing to carry out without any escrow transaction at all.

In arguing the contrary, International emphasizes that the arbitration clause refers to "transactions" — plural. But the reference is not just to "transactions," but to "transactions contemplated hereby," that is, transactions contemplated by the escrow agreement. The transactions that the escrow agreement contemplated were the escrow transactions — the tendering of documents, the tendering of funds, and their later delivery. There were several escrow transactions, and the use of the plural thus was proper.

Reading the arbitration clause to apply only to claims arising from or related to the escrow agreement or the escrow transactions accords not only with the language but also makes sense in context. The primary undertaking between Triple I and International was for issuance of a financial guarantee bond. The parties did not agree to arbitrate disputes arising from or related to that transaction. A financial guarantee bond of course could have been issued without any escrow arrangement at all. That the parties chose to carry out the main agreement by means of an escrow arrangement — and that the escrow agreement called for arbitration of disputes arising from or related to the escrow agreement and escrow transactions — hardly evinces an intent to arbitrate disputes arising from or related to the main agreement. To hold otherwise would be to let the tail wag the dog.

International notes, though, that an arbitration clause in an agreement

sometimes can require arbitration of a dispute arising not from the agreement itself but from another source, including another agreement. That is correct. But this occurs only when the arbitration clause applies to the dispute at issue. That, in turn, ordinarily is so only when the dog is wagging the tail. When an arbitration clause in one agreement does not apply to claims arising from or related to a different agreement, we have not required arbitration.

As confirmation of this analysis, we address a case on which International relies and then three decisions in which we did *not* require arbitration.

International relies on *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308 (11th Cir. 2005). That case involved a residential note and mortgage. The husband signed a note that included a clause requiring arbitration of all disputes "arising from or relating to this contract or the relationships which result from this contract." *Blinco*, 400 F.3d at 1310. The husband and wife signed a mortgage. The husband and wife brought a lawsuit against a successor to the note's payee alleging statutory violations relating to the servicing of the note and mortgage. Not surprisingly, we held the dispute covered by the arbitration clause (and, separately, we held the clause binding not only on the husband but also on the wife and the successor to the original payee). In holding the clause applicable to this dispute, we said:

> [I]t is difficult to understand how [the defendant] could be a servicer

if there were no Note, and more importantly, how [the defendant] could face statutory servicer liability if there were no Note to service.

*Blinco*, 400 F.3d at 1311.

In *Blinco*, the central document in the parties' relationship — the note — included an arbitration clause. In the case at bar, in contrast, the central document in the relationship between Triple I and International — the commitment for issuance of a financial guarantee bond — did *not* include an arbitration clause. This is the difference between the tail and the dog. Moreover, the arbitration clause in *Blinco* applied not only to disputes arising from or relating to the note, but also to disputes arising from or relating to the *relationships that resulted from* the note. There is no similar language in the arbitration clause at issue in the case at bar, and in any event the relationship between Triple I and International did not *result from* the escrow agreement. Finally, in *Blinco* it was "difficult to understand" how the defendant could face statutory servicer liability in the absence of a note to service. In the case at bar, in contrast, it is easy to understand how Triple I could have been defrauded without an escrow agreement; Triple I could simply have agreed to pay the fee in another manner. And it is easy to see how International could have breached its agreement to issue a bond without an escrow agreement; International could simply have failed to issue the bond.

Moreover, *Blinco* did not establish any rule that any dispute that could not

have arisen but for an agreement necessarily "arises from or relates to" the agreement within the meaning of an arbitration clause. We disapproved any such rule in *Seaboard Coast Line R.R. Co. v. Trailer Train Co.*, 690 F.2d 1343 (11th Cir. 1982). Trailer Train licensed certain rail cars to Seaboard and later, for tax reasons, leased some of the same cars to Seaboard. The license agreement included a clause requiring arbitration of any dispute arising under the agreement. The lease agreement, however, did not have an arbitration clause. Seaboard moved to compel arbitration of its claim that Trailer Train failed to deliver documents required by the lease agreement. The district court denied the motion, and we affirmed. We said that the license and lease, though related, were "separate and distinct," and that the terms of one could not control a breach of the other. *Seaboard*, 690 F.2d at 1352. We noted the federal policy favoring arbitration but said the policy "cannot serve to stretch a contract beyond the scope originally intended by the parties." *Id.* And we quoted with approval the Second Circuit's statement in *Necchi v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965), that a dispute does not "arise out of or in connection with" a contract just because the dispute would not have arisen if the contract "had never existed." *Seaboard*, 690 F.2d at 1351.

This same reasoning is fully applicable in the case at bar. The bond commitment and escrow agreement at issue here, like the license and lease at issue

11

in *Seaboard*, were "separate and distinct." And the quotation from *Necchi* puts to rest International's contention that Triple I's claims must be arbitrable because they could not have arisen had the escrow agreement not existed. Moreover, here, unlike in *Necchi*, Triple I's claims *could* have arisen even in the absence of any escrow agreement.

Two other cases in which we did *not* require arbitration also deserve mention. In *Klay v. All Defendants*, 389 F.3d 1191 (11th Cir. 2004), some of the plaintiff physicians had entered contracts with the defendant health maintenance organizations that included broad arbitration clauses. The physicians rendered services covered by the contracts (as to which the physicians were therefore among the HMO's "participating providers") but also rendered other services that were not covered by the contracts (as to which the physicians were therefore "nonparticipating providers"). We held that the physicians were not required to arbitrate their claims based on services rendered outside the contracts, which were referred to as "non-par claims." In reaching that result, we relied on the context and on the nature of the contracts and found even the broadest language in any of the contracts insufficient to require arbitration:

> Because we find that even the broadest arbitration clauses could not compel arbitration of non-par claims in this instance, we need not parse through the language used in each HMO's arbitration agreements.

*Klay*, 389 F.3d at 1201 n.11. In the case at bar, as in *Klay*, the parties agreed to an arbitration clause as part of a contract, but that contract had a limited scope, and in context the arbitration clause was not broad enough to extend to the claims at issue, which arose independently of the contract with an arbitration clause.

Similarly, in *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109 (11th Cir. 2001), there was an oral agreement between Telecom Italia, SpA ("Telecom Italia") and Wholesale Telecom Corporation ("WTC"), under which Telecom Italia would use its switch in Rome to route calls for WTC to any place in the world. Some of the calls originated in the United States. Telecom Italia did not have legal authority to transport calls in the United States. At Telecom Italia's urging, WTC agreed to lease circuits from a Telecom Italia subsidiary, Telemedia International U.S.A., Inc. ("TMI"), in order to get calls from the United States to the switch in Rome.

The oral agreement between WTC and Telecom Italia included no provision for arbitration. The written lease between WTC and TMI, in contrast, included a clause requiring arbitration of any dispute "arising out of or relating to" the lease.

The relationships went sour. Telecom Italia and WTC filed claims against one another. WTC filed a claim against TMI asserting tortious interference with the oral agreement between WTC and Telecom Italia. TMI moved to compel arbitration, asserting that the tortious interference claim arose from or related to

13

the lease; the lease was, after all, the only reason for TMI's involvement in the entire undertaking. But the district court denied the motion, and we affirmed.

After reviewing our leading cases addressing clauses requiring the parties to an agreement to arbitrate disputes "arising from" or "related to" the agreement, we said:

> It is possible to harmonize the results in these four cases by focusing on whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties. Disputes that are not related — with at least some directness — to performance of duties specified by the contract do not count as disputes "arising out of" the contract, and are not covered by the standard arbitration clause. . . . However, where the dispute occurs as a fairly direct result of the performance of contractual duties . . . , then the dispute can fairly be said to arise out of or relate to the contract in question, and arbitration is required.

*Telecom Italia*, 248 F.3d at 1116. Applying this standard, we concluded that TMI's alleged tortious interference with the WTC-Telecom Italia oral agreement did not arise from or relate to the WTC-TMI lease, despite the overlap between the contracts. In support of this conclusion, we said that TMI could have interfered with the WTC-Telecom Italia agreement "even if TMI had no contractual relationship with WTC." *Id*.

In the case at bar, as in *Telecom Italia*, there is an obvious relationship between the two contracts at issue. But here, as in *Telecom Italia*, International could have breached its bond commitment and defrauded Triple I even if there had

14

been no escrow agreement at all. Triple I's claims are not related — with at least some directness — to the performance of duties specified in the escrow agreement. The escrow agreement's arbitration clause does not apply to Triple I's claims against International.

## IV. Conclusion

The principal agreement between Triple I and International was for issuance of a financial guarantee bond in exchange for a fee. The agreement did not include an arbitration provision. Triple I, International, and an escrow agent were parties to a separate escrow agreement that included an arbitration clause. But the terms and logical import of that clause did not extend to disputes arising not from any failure to perform the escrow agreement but only from the failure to perform — and fraudulent enticement into — the agreement for issuance of the bond. The district court's order denying the motion to compel arbitration of this dispute is **AFFIRMED.**