[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12463
Non-Argument Calendar

_____

D.C. Docket No. 1:18-cv-23912-RNS

MARTHA PHILLIPS, et al.,

Plaintiffs-Appellants,

versus

NCL CORPORATION LTD.,
a foreign corporation doing business as
NORWEGIAN CRUISE LINES,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 10, 2020)

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

PER CURIAM:

Martha Phillips, Jerry Phillips, Darren Brown, Rosemary Elias, and Luis Perez-Hernandez (the Passengers) purchased a travel insurance plan from Norwegian Cruise Lines (Norwegian) as part of a cruise package.  They later filed a putative class action suit raising claims under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and for unjust enrichment, alleging that Norwegian failed to disclose profits it would earn in connection with the sale of the travel insurance.  The district court granted Norwegian's motion to compel arbitration and dismiss the class allegations.  This is the Passengers' appeal.

I.

Between 2016 and 2017, each of the Passengers booked a Norwegian cruise. During the booking process, they elected to purchase Norwegian's Booksafe Travel Protection Plan (the Travel Plan), which bundled a Travel Insurance Policy, Cancellation Fee Waiver Program, and Carefree Worldwide Emergency Assistance Program into one product package.  Norwegian administered the Cancellation Fee Waiver Program itself, but used third parties to administer the other two products in the package.  The travel insurance policy, which is the Travel Plan product at issue here, was administered by Aon Infinity Travel Practice and underwritten by either Nationwide Mutual Insurance Company and Affiliated Companies or Transamerica Casualty Insurance Company.

2

The process for purchasing the Travel Plan, as it existed at the time the Passengers purchased it, was this. During the booking process for a cruise, Norwegian required all passengers to elect or waive the Travel Plan coverage. If elected, passengers paid the Travel Plan cost to Norwegian at the same time that they paid for their cruise ticket. The costs of the cruise were broken down into a list of "booking components" that included separate amounts for "guest fare" and "insurance." [1] A "gross total" amount was provided as the sum of the components. Once final payment for the cruise had been made, a passenger could no longer purchase the Travel Plan. After passengers purchased the cruise (and the Travel Plan, if elected), Norwegian sent each of them a confirmation email which included a receipt showing payment for the cruise and the Travel Plan and asking them to read the "legally binding Guest Ticket Contract" (Guest Contract). When they checked in for their cruise, passengers were again directed to the Guest Contract and were required to acknowledge and accept its terms.

Section 2 of the Guest Contract provided that:

[T]his Contract governs the relationship between the Guest and the Carrier . . . . The Guest agrees that, except as expressly provided herein, this Contract constitutes the entire agreement between the Guest and Carrier, and shall supersede and exclude any prior representations that may have been made in relation to the cruise to

---

[1] The other booking components were "Government Tax/Port Exp/Fees" and "Prepaid Service Charges."

the Guest or anyone representing him/her by anyone, including but not limited to anything stated in the Carrier's brochures, advertisements, and other promotional materials, by Norwegian Cruise Line or NCL America employees or by third persons such as travel agents. . . .

The Guest Contract also contained a mandatory arbitration provision in Section 10(b), which stated:

Any and all disputes, claims, or controversies whatsoever, other than for personal injury, illness or death of a Guest, whether brought in personam or in rem or based on contract, tort, statutory, constitutional or other legal rights, including but not limited to alleged violation of civil rights, discrimination, consumer or privacy laws, or for any losses, damages or expenses, *relating to or in any way arising out of or connected with this Contract or Guest's cruise*, no matter how described, pleaded or styled, between the Guest and Carrier, with the sole exception of claims brought and litigated in small claims court, shall be referred to and resolved exclusively by binding arbitration pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York 1958) . . . and the Federal Arbitration Act . . . . (emphasis added).

Section 10(c) of the contract included a class action waiver provision stating that "any arbitration or lawsuit against carrier whatsoever shall be litigated by guest individually and not as a member of any class or as part of a class action." No part of the Guest Contract specifically referred to the Travel Plan or the travel insurance policy.

If a passenger purchased the Travel Plan, they also received the travel insurance policy contract, which includes a permissive arbitration clause for claims against either party arising out of or relating to the insurance policy contract or its

4

breach.[2]  Norwegian was not a party to that insurance contract, and this case does not involve a dispute about insurance claims and coverage.

The Passengers here all purchased the Travel Plan when they booked their cruises.  At some point after their purchase, they learned that Norwegian had received commissions from the sale of each travel insurance policy it sold through the Travel Plan.  On behalf of themselves and a putative class of other passengers who also purchased the Travel Plan, they filed suit against Norwegian in federal district court for alleged violations of FDUTPA and unjust enrichment.  They claimed that Norwegian had "utiliz[ed] deceptive and unfair marketing and sales practices" by failing to disclose kickbacks from the sale of the travel insurance policies and by charging an inflated price for those policies.  They also alleged that Norwegian had engaged in a "reinsurance scheme" in which the insurer reinsured the policy with a "reinsurance company" that Norwegian owned.  That practice, they asserted, led passengers to believe that the payments for the travel insurance policy were passed through to the insurer when in reality Norwegian kept most of

---

[2] The insurance policy arbitration clause states:

> Notwithstanding anything in the Policy to the contrary, any claim arising out of or relating to this contract, or its breach, may be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial rules except to the extent provided otherwise in this clause. Judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction thereof. Any arbitration will be by mutual agreement by all parties. All fees and expenses of the arbitration shall be borne by the parties equally.

those payments.  The Passengers sought compensatory damages and injunctive and declaratory relief.

Norwegian moved to compel arbitration and to strike the class allegations under the terms of the Guest Contract.  It argued that the Passengers' claims concerned Norwegian's representations about the Travel Plan and the travel insurance policy during the cruise booking process. Those claims, it asserted, related to and arose out of the Guest Contract and the Passengers' cruises.  Because the Travel Plan could be purchased only during the cruise booking process, Norwegian argued that the transaction was not independent of the ticketing transaction but instead was "intertwined with the circumstances that surrounded the transaction from which the Guest Ticket Contract originated."  It also pointed out that Section 8(d) of the Guest Contract explicitly addressed elective services administered by third parties and informed passengers that Norwegian earned a fee on the sale of those services, meaning that the Guest Contract expressly resolved the Passengers' claims.[3]  And because the arbitration provision in the Guest Contract was enforceable, it argued, so was the class action waiver.

---

[3] Section 8(d) of the Guest Contract provided:

> **For-Profit Entity:** Notwithstanding that the Carrier, at the Guest's option, arranges air transportation, hotel accommodations, ground transfers, shore excursions and other services with independent suppliers of such services, the

6

The Passengers responded that the Guest Contract's arbitration provision was not applicable to their consumer-fraud claims. They argued that their claims were brought against Norwegian in its role as an insurance distribution participant, not a cruise line carrier, and so were unrelated to either the Guest Contract or their cruises. Because the cost of the travel insurance policy was a separate cost distinct from the cruise cost, they argued, there existed two separate contracts and two distinct relationships. They noted that Section 8(d) of the Guest Contract referred only to elective services offering "physical" activities during the cruise — "air transportation, hotel accommodations, ground transfers, and shore excursions"— not travel insurance. The Passengers did concede that if the arbitration provision applied, the class action waiver also applied.

The district court granted Norwegian's motion to compel arbitration and dismissed the suit, reasoning that the Passengers' claims fell within the scope of the Guest Contract's arbitration provision because the purchase of a travel insurance policy for the cruise was significantly related to the Guest Contract and the Passengers' cruises. The court explained that "[t]he whole purpose of [the Travel Plan] is to protect [the Passengers'] stay on the cruise,

Guest understands and agrees that the Carrier, being a "for profit entity," earns a fee on the sale of such optional services.

7

which is the core of the [Guest] Contract . . . Indeed, without the existence of the [Guest] Contract there is no [Travel Plan] and therefore no claims for the [Passengers] to advance." The court also granted Norwegian's motion to strike the class, concluding that the Guest Contract's class action waiver applied based on the same reasoning.

II.

The Passengers do not dispute that they reviewed and accepted the terms of the Guest Contract, including the arbitration provision. Instead they argue that their claims do not fall under the scope of that provision.

We review de novo the district court's interpretation of the arbitration provision. Doe v. Princess Cruise Lines, Ltd., 657 F.3d 1204, 1213 (11th Cir. 2011). The Federal Arbitration Act requires expansive interpretation of arbitration agreements, but not at the expense of limiting language in contracts. Id. at 1213-14. Parties will not be required to arbitrate when they have not agreed to do so. Id. at 1214. "Whether a party has agreed to arbitrate an issue is a matter of contract interpretation . . . ." Telecom Italia, SpA v. Wholesale Telecom Corp., 248 F.3d 1109, 1114 (11th Cir. 2001).

The Guest Contract requires arbitration for any and all disputes "relating to or in any way arising out of or connected with this Contract or [the] Guest's cruise." We have interpreted the term "arising out of" as

focusing on "whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties." Doe, 657 F.3d at 1218. And the terms "relat[ing] to" and "connected with" require some direct relationship between the claims and the contractual duties. Id. at 1218–19. See also Telecom Italia, 248 F.3d at 1116 ("Disputes that are not related — with at least some directness — to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause.").

In Doe, we considered whether an employee's claims against a cruise line for rape and personal injuries fell within the scope of the arbitration provision contained in her employment contract. We held that they did not because: "[t]he cruise line could have engaged in that tortious conduct even in the absence of any contractual or employment relationship with Doe. As a result, those [] claims are not an immediate, foreseeable result of the performance of the parties' contractual duties or Doe's services as a Princess Cruise Lines employee, and they are not within the scope of the arbitration clause." Id. at 1219 (quotation marks omitted). We pointed out, by way of illustration, that a non-employee "could have brought these same . . . claims against the cruise line based on virtually the same alleged facts." Id. at 1220. The employee's remaining claims, however, were "based on

9

allegations that are dependent on her status as a seaman employed by the cruise line and the rights that she derives from that employment status." Id. at 1221. Those claims arose directly from her status as an employee and fell within the scope of the arbitration provision. Id. at 1220–21.

To be subject to the arbitration provision in the Guest Contract, the Passengers' claims, which are based on Norwegian's alleged "deceptive and unfair marketing and sales practices" during the cruise booking process, must relate with at least some directness to the Guest Contract or the Passengers' cruises. They do.

The Passengers argue that their consumer-fraud claims can be maintained without any reference to the Guest Contract, and whether Norwegian breached the Guest Contract has no impact on whether it violated FDUTPA. But at the same time it marketed and sold the cruises to the Passengers, Norwegian marketed and sold the Travel Plan, including the travel insurance policy that was part of the Plan. There was no independent, separate transaction, and instead, any alleged fraudulent conduct was wrapped up in the same transaction that culminated in the Guest Contract, which was the basis of the only contractual relationship between the Passengers and Norwegian. Because only a passenger who buys a cruise ticket can purchase the Travel Plan, Norwegian could not have engaged in

10

the alleged fraudulent conduct "in the absence of any contractual . . . relationship with" the Passengers. See Doe, 657 F.3d at 1219. Using our illustration in Doe as an analogy, because only a passenger can purchase Norwegian's Travel Plan, and the claims are based on Norwegian's sale of that Plan, a non-passenger could not have brought these claims against Norwegian. See id. at 1220.

The Passengers contend that their claims against Norwegian are solely in its capacity as a "distribution participant" for the insurer, and not as a cruise carrier. That contention fails. They acknowledge that their "claims have nothing to do with the coverages or any other terms of the Travel Insurance Policy; they relate solely to the *sale* of the Travel Insurance Policy, not to its content." Norwegian's marketing of the Travel Plan, including the insurance policy, was part of its marketing of the cruise and offered a way for potential passengers to be protected from losses related to the cruise. The arbitration clause in section 10(b) of the Guest Contract applies to the Passengers' claims, which "relat[e] to or in any way aris[e] out of or [are] connected with [the Guest] Contract or Guest's cruise."

Because the Passengers' claims fall within the scope of the Guest Contract's arbitration provision, the district court did not err in granting Norwegian's motion to compel arbitration.

11

III.

The Passengers concede that if the Guest Contract's arbitration provision applies, so does its class action waiver. That waiver provides that "[i]f Guest's claim is subject to arbitration under Section 10(b) above, the arbitrator shall have no authority to arbitrate claims on a class action basis." Because the Passengers' claims fall within the scope of the Guest Contract's arbitration provision, the class action waiver applies. The district court did not err in its dismissal of the class allegations.

**AFFIRMED.**