[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14455

_____

D.C. Docket No. 1:19-cv-01198-TWT

MICHAEL HEARN,
individually and on behalf of all other
similarly situated consumers,

Plaintiff - Appellee,

versus

COMCAST CABLE COMMUNICATIONS, LLC,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 5, 2021)

Before WILSON, GRANT, and TJOFLAT, Circuit Judges.

WILSON, Circuit Judge:

On March 19, 2019, plaintiff-appellee Michael Hearn filed a putative class action against Comcast Cable Communications LLC (Comcast), alleging that it had violated the Fair Credit Reporting Act (FCRA).  Hearn claimed that when he called Comcast to inquire about pricing and services, a Comcast representative conducted a credit check and pulled his credit information without his permission. After Hearn brought this suit, Comcast moved to compel arbitration, citing the Federal Arbitration Act (FAA) and a prior Subscriber Agreement between Hearn and Comcast.  The Subscriber Agreement contained an Arbitration Provision that broadly applied to "any claim or controversy related to Comcast" and specified that it survived the termination of the Agreement.  The district court denied Comcast's motion to compel arbitration.  Because we find that Hearn's FCRA claim relates to the Subscriber Agreement, we reverse the district court and remand for further proceedings.

I.

In December 2016, Hearn obtained services from Comcast for his residence in Mableton, Georgia (the Mableton address).  While securing these services, Hearn signed a work order acknowledging that he received a "Comcast Welcome Kit" that contained a Subscriber Agreement.  This Subscriber Agreement included an Arbitration Provision that stated: "Any dispute involving [the customer] and

2

Comcast shall be resolved through individual arbitration." The Agreement defined dispute as:

> [A]ny claim or controversy related to Comcast, including but not limited to any and all: (1) claims for relief and theories of liability, whether based in contract, tort, fraud, negligence, statute, regulation, ordinance, or otherwise; (2) claims that arose before this or any prior Agreement; (3) claims that arise after the expiration or termination of this Agreement; and (4) claims that are currently the subject of purported class action litigation in which you are not a member of a certified class.

The provision is a default part of the contract. Although customers can affirmatively opt out, it is undisputed that Hearn did not do so. Hearn later terminated Comcast's services in August of 2017.

In March 2019, Hearn called Comcast to inquire about pricing and obtaining services at the Mableton address again. While it is undisputed that Hearn called about obtaining services again, the parties characterize this conversation slightly differently. Comcast claims that Hearn called and inquired about pricing for reconnecting services. Hearn says he called to open a *new* account and not to reconnect services, as he had already terminated services under the Subscriber Agreement. Hearn claims that a Comcast representative pulled his credit information during the call without his knowledge or permission. This credit check lowered Hearn's credit score.

3

Hearn then brought a putative class action in the Northern District of Georgia alleging that Comcast violated the FCRA when it pulled his credit information without his permission. 15 U.S.C. § 1681 et seq. Comcast moved to compel arbitration. Hearn opposed this motion, claiming that (1) there was no valid arbitration agreement between the parties, (2) his FCRA claim does not relate to the Subscriber Agreement and therefore is not arbitrable, and (3) the Arbitration Provision is overly broad and unconscionable.

The district court denied Comcast's motion. It acknowledged that the parties intended for the Arbitration Provision to survive termination of the Subscriber Agreement but still found that Hearn's claim fell outside the scope of the Agreement. Relying primarily on Georgia contract law and out-of-circuit decisions, the district court concluded that no reasonable person would believe that the Arbitration Provision was so all-encompassing as to apply to all claims regardless of when they occurred or whether they related to the agreement.[1]

---

[1] The district court also relied on *Cordoba v. DIRECTV, LLC*, 347 F. Supp. 3d 1311 (N.D. Ga. 2018), in holding that the Arbitration Provision is too broad and therefore unenforceable as written. In *Cordoba* a plaintiff alleged that DIRECTV disclosed her personal information in violation of a federal statute. *Id.* at 1314. The district court denied DIRECTV's motion to compel arbitration despite the fact that the relevant arbitration clause purportedly applied broadly to "all disputes and claims between" the parties. *Id.* at 1320. The district court held that the plaintiff's claim was not subject to arbitration because the underlying claim did not "have some relationship to the contract containing the arbitration provision." *Id.* at 1321. While Hearn's case was pending on appeal, however, we reversed the district court's decision in *Cordoba*. *See Cordoba v. DIRECTV, LLC*, 801 F. App'x 723 (11th Cir. 2020) (per curiam). On appeal, we did not "address[] the more general question of whether the relevant arbitration provision [was] enforceable as to 'all claims and disputes'" but instead found the plaintiff's claim was arbitrable because it related to the underlying agreement. *Id.* at 725–26.

Next, the district court found that the FAA could only compel Hearn to arbitrate his FCRA claim if it "arose out of" or "relate[d] to" the earlier Subscriber Agreement. Ultimately, it held that Hearn's claim did not arise out of the Agreement. It recognized that there was a dispute of fact whether Hearn called Comcast to reconnect services or enter into a new agreement. Comcast claimed that Hearn called to reconnect services, and because the Subscriber Agreement contained a provision that addressed reconnecting a customer's services, Hearn's underlying claim related to the Agreement. Hearn argued that he did not call to reconnect services. The district court asserted that it had to resolve this factual dispute in favor of Hearn. It then found that the underlying FCRA claim did not relate to the Agreement, and Comcast could not compel arbitration.[2] This appeal followed.

On appeal, Comcast raises two arguments. First, Eleventh Circuit precedent demonstrates that the FAA requires courts to enforce valid arbitration agreements, including agreements as broad as the one at issue here. Second, even under the district court's limited construction of the FAA, this case must be arbitrated because Hearn's claim relates to the Subscriber Agreement.

II.

---

[2] Because the district court found that Hearn's claim did not relate to the Subscriber Agreement, it did not address whether enforcement of the arbitration provision would be unconscionable.

We review de novo a denial of a motion to compel arbitration as well as a district court's interpretation of an arbitration agreement. *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1263 (11th Cir. 2017).

## III.

"The FAA [] places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citation omitted). Section 2 of the FAA states:

> A written provision in any . . . contract evidencing a transaction . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

"This provision establishes a liberal federal policy favoring arbitration agreements." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (internal quotation mark omitted). Courts should construe "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

We have stated:

> There [] is nothing unusual about an arbitration clause . . .
> that requires arbitration of all disputes between the parties
> to the agreement. [And] [w]e have enforced such a clause

6

before because it evidenced a clear intent to cover more than just those matters set forth in the contract.

*Bd. of Trs. of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 1335, 1343 (11th Cir. 2010) (alteration adopted and internal quotation marks omitted).  We have reiterated this position—that an arbitration agreement can reach beyond the matters addressed in the underlying contract—in other cases.  *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000) (finding that an arbitration provision that required the parties to arbitrate any and all claims was not overly broad or vague); *cf. Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) ("If the [defendant] had wanted a broader arbitration provision, it should have left the scope of it at 'any and all disputes, claims, or controversies whatsoever' instead of including [a] limitation that narrowed the scope [of the clause] . . . .").

A "standard arbitration clause," however, generally includes language that limits the scope of the arbitrable issues to "any controversy or claim arising out of, or relating to [the] agreement, or the breach thereof." *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001).  When determining if a dispute "arises out of" or "relate[s] to" an underlying contract, we generally consider whether the dispute in question "was an immediate, foreseeable result of the performance of contractual duties." *Id.* at 1116; *see also Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1366–67 (11th Cir.

2008) (recognizing that the Eleventh Circuit has employed "various verbal formulae to describe the relationship between disputes and arbitration clauses," but ultimately focusing on foreseeability). In other words, there must be "some direct relationship between the dispute and the performance of duties specified by the contract" in order to find that the dispute arises out of, relates to, or is connected to the underlying agreement. *See Doe*, 657 F.3d at 1218–19.

IV.

While we have previously enforced arbitration provisions that "evidenced a clear intent to cover more than just those matters set forth in the contract," *Citigroup*, 622 F.3d at 1343 (alteration adopted), we have not enforced a provision exactly like the one in this case. Here, the Arbitration Provision is different in that it applies broadly to all disputes between the parties *and* applies even if the dispute arises after the Subscriber Agreement is terminated. While the language in some of our previous decisions may indicate that the full scope of the Arbitration Provision is enforceable, this is a close question that we leave for another day. We need not address that question because we find that Hearn's FCRA claim relates to the Subscriber Agreement.

Hearn's FCRA claim relates to the Subscriber Agreement and therefore falls within the Arbitration Provision. To start, Comcast was able to conduct a credit check *only* because of its previous relationship with Hearn. It used Hearn's

8

personal information, including his social security number, that it had on file from the Subscriber Agreement to conduct the credit check. *Cf. Doe*, 657 F.3d at 1219 (focusing on the fact that the defendant could have "engaged in [the alleged] tortious conduct even in the absence of any contractual . . . relationship with [the plaintiff]" as important in finding a claim did not arise out of or relate to the plaintiff's employment contract).

Also, more importantly, the Subscriber Agreement contains provisions that specify duties relating to Comcast's alleged unlawful credit inquiry. *See id.* at 1218–19 (explaining that there must be "some direct relationship between the dispute and the performance of duties specified by the contract" to find a claim arose out of an underlying agreement). In relevant part, it includes provisions entitled "Reconnection Fees and Related Charges" (the Reconnection Provision), "Our Right to Make Credit Inquiries" (the Credit Inquiries Provision), and "Termination of this Agreement" (the Termination Provision).

Hearn claims he was not calling to reconnect services, and in turn tries to dispute the relevance of the Reconnection Provision. The Reconnection Provision states:

> If you resume Service(s) after any suspension, we may require you to pay a reconnection fee. If you reinstate any or all Service(s) after disconnection, we may require you to pay an installation fee and/or service activation fee . . . . Reconnection of the Service(s) is subject to our credit policies, this Agreement and applicable law.

Hearn claims that the Reconnection Provision applies only if Comcast's services were suspended or disconnected. And, according to Hearn, services are suspended or disconnected *only* when the customer fails to pay or pays late. He cites to a provision of the Agreement entitled "Suspension/Disconnect" to support this argument. In relevant part, that provision states: "If you fail to pay the full amount due for any or all of the Service(s) then Comcast . . . may suspend or disconnect any or all the Service(s) you receive." So, Hearn says that because he *terminated* services, rather than having them suspended or disconnected, he could not have been attempting to reconnect services, and therefore the Reconnection Provision does not relate to his claim.

Reading the Subscriber Agreement as a whole, Hearn's position regarding the Reconnection Provision is incorrect. The Agreement uses the terms "suspend" or "disconnect" to refer broadly to discontinuing services—not only to situations where a customer has failed to pay or paid late. For instance, under the Termination Provision, Comcast "reserve[d] the right" to "terminate or suspend" services in other circumstances, like if there were public health or safety concerns. And the Termination Provision also repeatedly states that Comcast will disconnect its services upon termination, regardless of who terminates. Thus, contrary to Hearn's position, the Reconnection Provision does not only apply when a customer did not pay or paid late. Also, the terms terminate, suspend, and disconnect are not

10

necessarily mutually exclusive.  In fact, under the Agreement, Comcast's services are *always* disconnected after termination.

The district court also misinterpreted the Subscriber Agreement.  It accepted Hearn's position that he was calling Comcast to create a new account, not to reconnect his old account and subsequently stated that the claim therefore did not relate to the Agreement.[3]  In doing so, the district court did not consider the Reconnection Provision as a whole.

A comprehensive reading of the Reconnection Provision demonstrates that even if we accept Hearn's statement that he was not calling to reconnect services, Hearn's claim still relates to the agreement.[4]  It is undisputed that Hearn was calling to inquire about obtaining Comcast's services at the Mableton address again.  Because he previously used Comcast services, Comcast would be "reinstating" services that were previously disconnected.  Thus, Hearn's claim

---

[3] We treat motions to compel arbitration similarly to motions for summary judgment.  *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) ("We agree with our sister circuits that a summary judgment-like standard is appropriate and hold that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement.").  Therefore, at this stage, the district court had to view the facts in the light most favorable to Hearn, the nonmovant.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

[4] Also, the debate over the meaning of the term "reconnect" is seemingly semantic.  The Subscriber Agreement does not clearly define "reconnection" or the other related terms used in the Reconnection Provision.

11

relates to the Reconnection Provision: that Provision explicitly addresses situations where customers seek to resume and reinstate Comcast services.

Moreover, it is foreseeable that Comcast would use Hearn's information that it already had on file to reinstate services. *See Doe*, 657 F.3d at 1219–20 (looking to an underlying employment agreement to discern if a claim is related). This situation is anticipated by the Agreement. Therefore, even resolving this potential factual dispute in Hearn's favor, the Reconnection Provision relates to the underlying claim.

Similarly, the Credit Inquiries Provision directly relates to Hearn's FCRA claim. The Credit Inquiries Provision authorizes Comcast "to make inquiries and to receive information about [the customer's] credit experience." And, relatedly, the Reconnection Provision explicitly sets out that it is subject to the Credit Inquiries Provision. The Credit Inquiries Provision thus directly relates to Hearn's claim—Comcast used the private information from Hearn's file to conduct a credit check after Hearn called to inquire about reinstating the company's services. And, just like with the Reconnection Provision, the Agreement contemplates this type of situation.

Our holding is narrow—we do not answer if the broad scope of the Arbitration Provision is enforceable under the FAA. We simply find that Hearn's FCRA claim relates to the Subscriber Agreement because of: the FAA's liberal

12

federal policy favoring arbitration agreements, the relevant provisions in the Subscriber Agreement applicable to Hearn, and the fact that Comcast would not have access to Hearn's personal information—and therefore could not have engaged in the allegedly tortious conduct—but for the pre-existing Agreement. Because Hearn's claim relates to the Subscriber Agreement, we reverse the district court and remand so it can determine the merits of the parties' remaining arguments related to Comcast's motion to compel arbitration.

**REVERSED AND REMANDED.**