914 So.2d 23 (2005)
CITIGROUP, INC.; Citicorp Investment Services, Inc.; and Citigroup Global Markets, Inc., formerly Salomon Smith Barney, Inc., Appellants,
v.
Danny D. BOLES, Linda M. Boles, and Scott D. Sullivan, Appellees.
No. 4D04-3480.
District Court of Appeal of Florida, Fourth District.
September 28, 2005.
Rehearing Denied November 29, 2005.
Mark F. Bideau, Joseph C. Coates, III, and Lorie M. Gleim of Greenberg Traurig, P.A., West Palm Beach, and Elliot H. Scherker and Pamela A. DeBooth of Greenberg Traurig, P.A., Miami, for appellants.
Jane Kreusler-Walsh and Rebecca Mercier-Vargas of Jane Kreusler-Walsh, P.A., and Theodore Babbitt of Babbitt, Johnson, Osborne & LeClainche, P.A., West Palm *24 Beach, for Appellees-Danny D. Boles and Linda M. Boles.
STONE, J.
We affirm an order denying Citigroup's (Appellants collectively) motion to compel arbitration. The primary issue on appeal is whether the arbitration clause in the Boleses' investment account agreement incorporates tort claims that are wholly unrelated to the account.
Danny Boles acquired stock in MCI Communications, which was subsequently acquired by Worldcom. Boles, having no training in stock analysis or investment evaluation, claims that he read and relied upon a number of investment publications for guidance regarding whether to hold or to sell this stock. Between 1998 and 2001, Boles read articles in Fortune, Forbes, Smart Money, and Business Week magazines. Jack Grubman, Smith Salomon Barney's (SSB) top telecommunications analyst, was quoted in each of the articles listed in the complaint. SSB was a wholly-owned subsidiary of Citigroup.
The Boleses' four-count complaint against Citigroup alleged false information negligently supplied for the guidance of others, outrageous conduct, fraud, and violation of Florida's Blue Sky laws. The complaint also explored the relationships between SSB, through Grubman, and Worldcom's CEO, Bernard Ebbers, and CFO, Scott Sullivan, alleging substantial financial gain for these principals as a result of Grubman's positive ratings in the investment industry. Subsequently, Worldcom filed for bankruptcy.
The Boleses maintained an investment account as a repository for their Worldcom stock. By coincidence, the couple moved the stock into an account with SSB in April 2003, long after the decision to hold the stock, long after Worldcom had declared bankruptcy, and long after the stock had become de-valued. This account essentially served only a housekeeping function. The Boleses do not allege bad advice from the investment house regarding their Worldcom stock, nor do they name any employees or brokers of the particular branch office where they opened the account. In fact, the account form does not even address investment advice.
As a requirement of account commencement, the couple signed a broadly worded account application and client agreement. The agreement is four pages long, is entirely boilerplate, and includes an arbitration clause on page three. The paragraph reads as follows:
I agree that all claims or controversies, whether such claims or controversies arose prior, on or subsequent to the date hereof, between me and SB and/or any of its present or former officers, directors, or employees concerning or arising from (i) any account maintained by me with SB individually or jointly with others in any capacity; (ii) any transaction involving SB or any predecessor firms by merger, acquisition or other business combination and me, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between us, any duty arising from the business of SB or otherwise, shall be determined by arbitration before, and only before, any self-regulatory organization or exchange of which SB is a member.
Eventually, the stock was sold out of this account.
The complaint does not refer in any manner to the agreement or the account in question. There is clearly no nexus between this dispute and the account. The fact that the Boleses subsequently opened *25 a Smith Barney account was simply an extraneous and fortuitous event.
Notwithstanding that arbitration is favored in the law, construction of an arbitration clause remains subject to the contract law requirement "that the court discern the intent of the parties from the language used in their agreement." Citigroup, Inc. v. Amodio, 894 So.2d 296, 298 (Fla. 4th DCA 2005). "[A]rbitration is mandatory only where the subject matter of the controversy falls within what the parties have agreed will be submitted to arbitration." Ocwen Fed. Bank FSB v. LVWD, Ltd., 766 So.2d 248, 249 (Fla. 4th DCA 2000). "[I]t is the language of the agreement that defines the scope of an arbitration agreement." Amodio, 894 So.2d at 298.
Arbitration clauses are typically characterized as either narrow or broad; narrow clauses often use the language "arising under," and broader clauses use wording such as "arising out of or relating to" in specifying covered disputes. CSE, Inc. v. Barron, 620 So.2d 808, 809 (Fla. 2d DCA 1993). Here, the clause covers "all claims or controversies whether such claims or controversies arose prior, on or subsequent to the date hereof, . . . concerning or arising from" any account maintained at SSB, any transaction involving SSB, or construction, performance or breach of the agreement with SSB. In addition, the clause includes claims and controversies not only with SSB, but also with its present or former officers, directors, or employees.
In Amodio, this court affirmed denial of a motion to compel arbitration under a clause that is not as broadly worded as that in this case. On the other hand, Amodio's facts show far more connection between the agreement there and the stock in question and, despite this, this court held that the issues in question were beyond the scope of the arbitration clause.
We recognize that doubts regarding arbitrability should be resolved in favor of the arbitration. This stricture, however, is applicable where there is uncertainty. Ocwen, 766 So.2d at 249. A clause is not uncertain simply because it is worded broadly and "where the contract provision is not doubtful, arbitration should not be ordered." Ocwen, 766 So.2d at 249.
In Seifert v. U.S. Home Corp., 750 So.2d 633, 642-43 (Fla.1999), the supreme court determined that a wrongful death claim was not controlled by an arbitration clause in a contract between a home buyer and builder. The court recognized that an unrelated "mere coincidence" was not sufficient to compel arbitration. Id. at 638. The supreme court recognized that "even in contracts containing broad arbitration provisions, the determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause." Id.
In this case, the complaint does not involve or refer to the agreement, and the agreement is not related in any way to the allegedly tortious investment advice. Furthermore, the alleged misrepresentations made by Grubman were made long before the account was opened, and the stock was nearly worthless before it was placed in the Boleses' account. The Boleses' claims unquestionably sound in tort and as violations of section 517.301, Florida Statutes, the Florida Securities Investors Protection Act, and do not concern the agreement or any transaction or relationship of any kind between the Boleses and SSB.
Notwithstanding the broad wording of the text, we need not turn a blind eye to *26 the context in which it appears. The Boleses' claims could have been raised by any member of the public who had relied upon Grubman's advice in the publications.[1]
This case is also unlike Hirshenson v. Spaccio, 800 So.2d 670, 676 (Fla. 5th DCA 2001), where the Fifth District affirmed an order confirming arbitration of a dispute over bad investment advice. There, the account was opened for the specific purpose of implementing investment advice, and the contract between the parties contemplated that such advice would be given and taken.
Here, patently, there is simply no relationship between the subsequent opening of the SSB account and the wrongs alleged. Not only is it unlikely that the Boleses intended to sign their rights away by opening the account, there is no reason to accept that SSB contemplated claims like those of the Boleses when drafting the account application form that imposed no obligations on SSB.
We do not address any question of unconscionability which, although mentioned by the trial court, was not raised by the parties. We also do not address the question of whether the arbitration clause is applicable to all of the appellants, as now that issue is moot.
SHAHOOD and MAY, JJ., concur.
NOTES
[1] We emphasize that we do not consider any issue concerning the merits of the complaint or whether it states a cause of action against Citigroup.