HAZOUKI, J.
Appellant, Florida Environmental Services, Inc. (“FES”), appeals the trial court’s non-final order compelling arbitration on three counts of FES’s eight-count complaint against appellees, Michael and Cher Rentoumis, and staying the claims pending the outcome of the arbitration. We affirm without discussion the order of arbitration as to subsection (b) of count I as appellant concedes that this subsection is covered in the arbitration clause in the Purchase Agreement. We reverse the order compelling arbitration as to counts 1(a), II and IV because the arbitration clause in question applies to accounting determinations used in calculating the Net Book Value Adjustment Amount or the Additional Payment which are not the subject of the aforementioned counts.
The complaint alleges the following facts. Michael Rentoumis (“Rentoumis”) was the sole shareholder of Envirodyne, a corporation in the business of environmental testing and analysis of materials, including wastewater, water, soil, and hazardous waste. He was approached by W. David Kimbrell, the sole shareholder of FES, regarding the purchase of Enviro-dyne assets. Rentoumis indicated he was interested in selling, and Kimbrell performed due diligence, spending over $150,000 over four months. Rentoumis insisted the sale remain confidential and forbade Kimbrell from contacting employees and regulatory agencies, otherwise Ren-toumis would terminate the negotiations.
In February 2005, Rentoumis provided Kimbrell with Envirodyne’s December 31, 2004 Balance Sheet reflecting a book value of $1,764,844.17 and represented it was accurate. This amount was relied upon in determining a purchase price. The purchase price was to be subject to certain post-closing adjustments, one of which was to take into account any decline in Enviro-dyne’s book value since the end of 2004. The adjustment was calculated according to the difference between the book value stated in the December 31, 2004 Balance Sheet and the book value as of the closing date. Before April 2005, Rentoumis told Kimbrell that the December 31, 2004 Balance Sheet was incorrect and provided the March 31, 2005 Balance Sheet indicating a book value of $1,274,704.17 and agreed it was to be used as a preliminary closing balance sheet. The formula for adjusting the purchase price was modified.
On May 6, 2005, FES and Rentoumis executed the Purchase Agreement for the sale of Rentoumis’s Envirodyne stock to FES. He conveyed the stock to FES in exchange for $2,590,140. FES paid $1,087,059 of that to discharge a debt encumbering certain Envirodyne property. Rentoumis was paid $1,503,081. This amount was subject to a post-closing adjustment based upon the increase or decrease of Envirodyne’s book value since the end of 2004. FES hired an accounting firm, approved by Rentoumis, which prepared the Closing Date Balance Sheet and found a book value of $858,502.
Under the terms of the Purchase Agreement, Rentoumis was to remain employed by the company through May 6, 2006. They executed a separate Employment Agreement.
After the sale, FES discovered that Rentoumis had misrepresented Enviro-dyne’s history and status in that over the years the Florida Department of Health had found numerous deficiencies including fraudulent proficiency testing results. By order of the Department of Health, Envi-rodyne had lost the necessary licenses and certifications to conduct several of the testing procedures it regularly performed.
*469 Rentoumis was terminated for cause on October 7, 2005. FES found that he had altered test results and issued false laboratory reports.
FES attempted to compromise with the Department of Health in its decisions against Envirodyne but eventually FES was forced to enter into a stipulation and surrender its licenses and certifications, its most valuable assets, and then merge with another company.
In the Purchase Agreement, which was attached to the complaint, Section VII is entitled “Purchase and Sale.” In section 7.03, it defines the purchase price which included the Closing Payment plus or minus (A) the Adjusted Closing Payment, plus (B) the Additional Payment, if any. Other sections discuss how these amounts are to be determined and applied. Section 7.09 then provides:
7.09 Buyer and the Stockholder shall submit any dispute concerning the accounting determinations used in calculating the Net Book Value Adjustment Amount[1] or the Additional Payment to a jointly selected accounting firm other than the Independent Accountant (the “Settlement Firm”) for resolution. If Buyer and the Stockholder cannot jointly agree on an accounting firm to serve as the Settlement Firm, each party shall submit the name of a national accounting firm (which firm shall not be either party’s accountants) to Buyer’s outside counsel, who shall select one of such firms by lot in the presence of a representative of the Stockholder. The determination of the Settlement Firm shall be final and binding on the parties and the award of the Settlement Firm (as accounting arbitrator) may be entered in any court of competent jurisdiction. The fees and expenses of the Settlement Firm shall be borne equally by the party whose stated position with respect [to] such disputed items is furthest in the aggregate from the final determination of the Settlement Firm. The Settlement Firm shall be provided with reasonable access to information necessary to resolve the dispute. The procedure described in this Section 7.09 is referred to herein as the “Dispute Resolution Mechanism.”
The trial court ordered arbitration on three counts of the complaint under this provision. Whether the trial court erred with respect to each count will be discussed in turn.
Count I of the complaint is an action for breach of contract and is divided into two parts. Part “a” is entitled “Breach of the Representations and Warranties” and contains nine subsections which name and describe each breach of the representations and warranties made by Rentoumis under section I of the contract. For example, FES first alleges that the contract represented and warranted that Rentoumis did not own directly or indirectly any interest or have any investment or profit participation in any corporation that was a competitor of or did business with Envirodyne. Rentoumis allegedly breached this warranty through his ownership or interest in a sanitary landfill located near Envirodyne’s property.
Subsection (a) of count I provides:
83. In paragraph 1.05 of the Purchase Agreement, Rentoumis represented and warranted that the Financial Statements were true, complete, correct, fairly presented the financial position and results of operations of the Compa *470 ny, and were prepared on a consistent basis with GAAP. In addition, Rentoum-is acknowledged that the December 31, 2004 Balance Sheet, which he provided, was relied upon by FES to value and analyze the financial condition of the Company and relied upon by FES in determining the Purchase Price.
84. Rentoumis breached the Representation and Warranty in paragraph 1.05 by, among other things: (a) misrepresenting that the figures presented in the December 31, 2004 Balance Sheet and/or other financial statements were accurate; (b) misrepresenting that the December 31, 2004 Balance Sheet and/or other financial statements fairly present the actual financial position and results of operations of Envirodyne; and (c) misrepresenting that the December 31, 2004 Balance Sheet and/or other financial statements were prepared in accordance with GAAP.
85. Rentoumis’ breach of the representation in paragraph 1.05 of the Purchase Agreement has caused FES to suffer damages.
The question of whether a disputed issue is subject to arbitration is a matter of contract interpretation, and our review is de novo. Ocwen Fed. Bank FSB v. LVWD, Ltd., 766 So.2d 248, 249 (Fla. 4th DCA 2000). In Citigroup, Inc. v. Boles, 914 So.2d 23 (Fla. 4th DCA 2005), this court discussed the application of arbitration provisions:
Notwithstanding that arbitration is favored in the law, construction of an arbitration clause remains subject to the contract law requirement “that the court discern the intent of the parties from the language used in their agreement.” Citigroup, Inc. v. Amodio, 894 So.2d 296, 298 (Fla. 4th DCA 2005). “[Arbitration is mandatory only where the subject matter of the controversy falls within what the parties have agreed will be submitted to arbitration.” Ocwen Fed. Bank FSB v. LVWD, Ltd., 766 So.2d 248, 249 (Fla. 4th DCA 2000). “[I]t is the language of the agreement that defines the scope of an arbitration agreement.” Amodio, 894 So.2d at 298.
Arbitration clauses are typically characterized as either narrow or broad; narrow clauses often use the language “arising under,” and broader clauses use wording such as “arising out of or relating to” in specifying covered disputes. CSE, Inc. v. Barron, 620 So.2d 808, 809 (Fla. 2d DCA 1993).
Boles, 914 So.2d at 25. “To determine whether a claim falls within the scope of an arbitration agreement, we must look beyond the legal cause of action and examine the factual allegations of the complaint.” Singer v. Gaines, 896 So.2d 851, 854 (Fla. 3d DCA 2005).
In Gale Group, Inc. v. Westinghouse Electric Corp., 683 So.2d 661 (Fla. 5th DCA 1996), Westinghouse sold its manufacturing business to Gale. Gale was to make post-closing payments to Westinghouse of a percentage of Gale’s collections from “ineligible accounts receivable” which were not defined by the contract. Gale refused to pay the disputed amounts. Upon suit being filed by Westinghouse, Gale filed a motion to compel arbitration which was denied. Gale also filed a motion to sever arbitrable issues which was denied because the court found that although the contract had an arbitration clause, there was no issue to arbitrate until the court determined the meaning of “ineligible accounts receivable.” The arbitration clause provided, “In the event that [Westinghouse] and [Gale] disagree with respect to the amount of any payment due [Westinghouse] pursuant to this Section 14(b)” then after certain time limits they were to choose a mutually agreeable “Big Six” accounting firm for determination. Id. at *471 662. In considering motions to compel arbitration, the trial court must determine “(1) whether the parties entered into a valid written agreement to submit to arbitration; (2) whether an arbitrable issue exists; and, (3) whether the moving party has waived the right to submit the arbitra-ble issue to arbitration.” Id. at 662-63. The district court disagreed with the trial court’s ruling and found that the broad language of the arbitration clause in Gale applied to post-closing payments and that is what each count of Westinghouse’s complaint was claiming. “The parties clearly intended to submit to arbitration all disputes regarding amounts owed to Westinghouse under Section 1.4(b). The parties did not limit the arbitration provision to any particular aspect of a dispute arising under Section 1.4(b).” Id. at 663. Therefore, the accountant could define “ineligible accounts receivable.”
In McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 868 F.2d 825 (2d Cir.1988), there was a narrow and specific arbitration clause which called for the appointment of an independent tax counsel to resolve disputes over certain computations. The court found that the clause was intended to reach only tax issues, especially because the clause referred to the appointment of a tax counsel instead of an arbitrator of more general expertise.
The arbitration clause at issue here is limited to “any dispute concerning the accounting determinations used in calculating” the two amounts to be determined after closing. The arbitrator was to be an accounting firm. The arbitration clause is narrowly worded and does not provide for the accounting firm to determine whether the contract was breached by either party. We reverse the order compelling arbitration of count 1(a).
The trial court also found count II for breach of implied covenants of good faith and fair dealing was entirely intertwined with the breach of contract claim. We agree, and because we find that the breach of contract claim is not arbitrable under the parties’ contract, neither is the claim for breach of implied covenants of good faith and fair dealing.
The trial court also compelled arbitration of count IV which was for breach of the Employment Agreement entered into by the parties under which Rentoumis was to be employed as President of Envirodyne for twelve months following the execution of the Purchase Agreement. FES alleged that Rentoumis breached the Employment Agreement, a separate agreement from the Purchase Agreement, by acting in competition with FES and disclosing proprietary information contrary to the Employment Agreement’s provisions.
Although there may be some connection between the Additional Payment provided for in the arbitration clause in the Purchase Agreement and payments to Ren-toumis under the Employment Agreement, the Employment Agreement is a separate contract and does not contain an arbitration clause. Even if the arbitration clause was a part of the Employment Agreement, just as it was inapplicable to counts 1(a) and II, a determination of whether Ren-toumis breached the non-compete provision does not come within the parameters of the arbitration clause.
FES finally argues that because the arbitrable claims are severable, the trial court abused its discretion by staying the rest of the claims in its complaint until arbitration was complete. We find the trial court did not abuse its discretion.

Affirmed in Part; Reversed in Part.

GUNTHER and POLEN, JJ., concur.

. The Net Book Value Adjustment Amount is the difference between the Net Book Value (total assets less total liabilities) of the Company as of the Closing Date and the Net Book Value of the Company as of December 31, 2004.