IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

ALL-SOUTH
SUBCONTRACTORS, INC.,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

Appellant,

v.                                              CASE NO. 1D15-5862

AMERIGAS  PROPANE,  INC.
and   AMERIGAS   PROPANE,
L.P.,

Appellees.

_____/

Opinion filed August11, 2016.

An appeal from the Circuit Court for Escambia County.
Edward P. Nickinson, III, Judge.

Charles Philip Hall and J. Phillip Warren of Taylor, Warren & Weidner, P.A.,
Pensacola, for Appellant.

Robert Palmer of Wade, Palmer & Shoemaker, P.A., Pensacola, and George J.
Murphy of Gibbons P.C., Philadelphia, *pro hac vice*, for Appellees.

JAY, J.

We have for review the trial court's final order dismissing with prejudice

Appellant's amended complaint for lack of subject matter jurisdiction and granting

Appellees' motion to compel arbitration. The issue presented is whether an arbitration clause contained in a bulk mailer sent out in 2012 by Appellees to its customers applied retroactively to a business transaction between Appellant and Appellees that was finalized two years earlier. We hold it does not and reverse.

On December 3, 2014, Appellant All-South Subcontractors, Inc., filed an Amended Class Action Complaint naming as defendants Appellees Amerigas Propane, Inc., and Amerigas Propane, L.P., and alleging Appellees' practice of charging "Fuel Recovery Fees" to its customers, including Appellant and other Florida customers of Appellees, violates the Florida Deceptive and Unfair Trade Practices Act. Appellant also pleads a cause of action for unjust enrichment. According to the factual allegations of the amended complaint, Appellant is "a small commercial roofing business," and Appellees are "the largest seller[s] of propane in the United States." In 2010, while working on the roof of the National Flight Academy in Pensacola, Florida, Appellant purchased propane from Appellees.

Appellees filed a motion to dismiss the amended complaint for lack of subject matter jurisdiction, to compel arbitration, and to dismiss the complaint for failure to state a cause of action. In its motion, Appellees argue "the putative class action must be dismissed because the dispute between the parties is governed by an arbitration agreement between AmeriGas and its customers, including All-South, which requires such disputes be resolved through binding arbitration." Attached to the

2

motion is the affidavit of James Armstrong, president of Yoder and Armstrong Printing.* In his affidavit, Mr. Armstrong attests that on August 12, 2012, he was instructed by Appellees "to mail written notice of the General Terms and Conditions of AmeriGas Propane, L.P.[,] Relating to the Supply of Propane and Lease of Propane Related Equipment to Commercial Customers ('Terms and Conditions')." According to Mr. Armstrong, his company began preparation of the notices on November 29, 2012, and a "true and correct copy of the mailing that was prepared for and mailed to All South [sic]" is attached to his affidavit as "Exhibit A." The bulk mailer was delivered to the United States Postal Service on December 5, 2012. Each "tri-fold" document in the mailer contains the following introduction:

> We greatly appreciate the opportunity to be your propane supplier. It is our policy to annually provide all of our customers with our standard terms and conditions. We ask that you keep these standard terms attached with your other propane provider documents. We look

---

* "In considering a motion to dismiss challenging subject matter jurisdiction, a trial court may properly go beyond the four corners of the complaint and consider affidavits." Seminole Tribe of Fla. v. McCor, 903 So. 2d 353, 357 (Fla. 2d DCA 2005); see also Steiner Transocean Ltd. v. Efremova, 109 So. 3d 871, 873 & n.3 (Fla. 3d DCA 2013) (citing McCor and holding "a court is permitted to consider evidence outside the four corners of the complaint where the motion to dismiss challenges subject matter jurisdiction"). Cf. Mancher v. Seminole Tribe of Fla., Inc., 708 So. 2d 327, 328-29 (Fla. 4th DCA 1998) (recognizing that a court may consider affidavits when determining a motion to dismiss that challenges subject matter jurisdiction, but holding the issues in the motion to dismiss before it, which contended that the improper party was sued and that Seminole Tribe, Inc. enjoyed sovereign immunity were "not amenable to resolution by motion to dismiss because there [were] disputed factual questions"). The parties in the instant case have not argued the existence of disputed issues of fact.

forward to providing you with continued reliable service in the years ahead.

Following the introduction is the heading: "GENERAL TERMS AND CONDITIONS," under which paragraph "20"—entitled "CLAIMS AND ARBITRATION"—reads in relevant part as follows:

> Aside from credit or collection matters, Customer and Company agree that upon the request of either party, any dispute or controversy between the parties that in any way arises out of or relates to the Agreement or Company's provision of goods and services to Customer, will be decided by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. *Neither Company nor Customer shall be entitled to . . . arbitrate any claim as a representative or member of a class . . . .* Within thirty (30) days of receipt of this arbitration provision, *Customer can elect to opt out* of this provision (that is, exclude it from this Agreement) by sending written notice to Company by certified mail to [address in Pennsylvania] stating that Customer wishes to opt out of this arbitration provision.

(Emphasis added.) At the very bottom of the second page of the mailer appears the date "August 20, 2012," and, just above the date, paragraph "27" states: "For most non-residential Customers, these terms and Conditions will become effective 30 days after the date of this notice."

In a second affidavit attached to the motion, Appellees' district manager attests to his having reviewed Appellant's "file," which contained "Sales & Service Orders" for the sale of propane, and for the removal of spent tanks dated January 29, 2013, and February 26, 2013. Finally, according to a third affidavit from a member

4

of Appellees' legal department, Appellant did not respond to the opt-out provision of the "Terms and Conditions."

At the hearing on the motion to dismiss, Appellees argued that the "Terms and Conditions" governed the relationship between them and their customers; that the "Terms and Conditions" had been on their website since before December 2010 and were updated monthly; and that the 2012 bulk mailer was their attempt to assure that all of their customers understood they were bound by those very same "Terms and Conditions," which were already present on the company website. More concisely, Appellees' counsel asserted, "Mailing is the offer. Continuing Service with the company is acceptance of the offer. No signature is required," and "Failing to opt out is assent."

Appellant initially responded by pointing out that the alleged website terms and conditions—going back to 2010—were not before the trial court, and that the date on the bottom of the mailer was August 2012. Appellant then stressed that its lawsuit is premised on a 2010 invoice and questioned Appellees' ability to retroactively bind Appellant to an arbitration clause that Appellant had not known existed in 2010. Appellant urged that the bulk mailer could not, by itself, form the contract without any evident means of assent on Appellant's part, and, absent a contract, there could be no agreement to arbitrate.

5

After listening to these arguments, the trial court ruled: "The Court finds that particularly in the context of sophisticated litigants—this is not a consumer issue from the Plaintiff's side—that the arbitration provision is enforceable and *was assented to* by the Plaintiff, and the case will be dismissed on that basis only." (Emphasis added.) Contrary to this finding, we hold, as a matter of law, that Appellant did not "assent" to arbitrate the 2010 claims with Appellees.

"[T]he standard of review applicable to the trial court's construction of [an] arbitration provision, and its application of the law to the facts found, is *de novo*." Gainesville Health Care Ctr., Inc. v. Weston, 857 So. 2d 278, 283 (Fla. 1st DCA 2003) (citing Powertel, Inc. v. Bexley, 743 So. 2d 570, 573 (Fla. 1st DCA 1999)). "De novo review simply means that the appellate court is free to decide the question of law, without deference to the trial judge, as if the appellate court had been deciding the question in the first instance." Philip J. Padovano, Florida Appellate Practice §19:4 (2015 ed.).

In determining the issue of whether to compel arbitration, the principal consideration is whether there is an agreement to arbitrate. In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985), the United States Supreme Court explained, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." Id. at 626. Likewise, in Seifert v. U.S. Home Corp., 750 So. 2d 633 (Fla. 1999), the

6

Florida Supreme Court observed that "under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." Id. Later, in Shotts v. OP Winter Haven, Inc., 86 So. 3d 456 (Fla. 2011), the supreme court noted that "[c]hallenges to arbitration agreements in Florida generally focus on the first of the Seifert elements—'whether a valid written agreement to arbitrate exists . . . .'" Id. at 464 (quoting Seifert, 750 So. 2d at 636). The issue before us turns on the first of these three elements.

The supreme court in Seifert went on to elaborate that "because arbitration provisions are contractual in nature, construction of such provisions and the contracts in which they appear remains a matter of contract interpretation." 750 So. 2d at 636 (citing Seaboard Coast Line R.R. v. Trailer Train Co., 690 F.2d 1343, 1352 (11th Cir. 1982); R.W. Roberts Constr. Co., Inc. v. St. Johns River Water Mgmt. Dist., 423 So. 2d 630, 632 (Fla. 5th DCA 1982)). See also Shotts, 86 So. 3d at 464 (holding, "[t]he issue of 'whether a valid written agreement to arbitrate exists is controlled by principles of state contract law'" (quoting Powertel, 743 So. 2d at 574)). It held that "the determination of whether an arbitration clause requires arbitration of a particular dispute necessarily 'rests on the intent of the parties,'" and further reasoned that "[a] natural corollary of this rule is that no party may be forced

7

to submit a dispute to arbitration that the party did not intend and agree to arbitrate." Seifert, 750 So. 2d at 636 (quoting Seaboard, 690 F.2d at 1348, 1352).

Appellant predicates its argument for reversal on the general rule that mutual assent is a condition precedent to the formation of a contract and that absent mutual assent, neither the contract nor any of its individual provisions come into existence. See generally Gibson v. Courtois, 539 So. 2d 459, 460 (Fla. 1989). Specifically, Appellant asserts that the bulk mailer was not a valid written agreement to arbitrate the earlier transaction because, fundamentally, Appellees did not reveal how Appellant could have anticipatorily assented to the written "Terms and Conditions" it had never seen prior to the receipt of the 2012 mailer. See, e.g., Steve Owren, Inc. v. Connolly, 877 So. 2d 918, 920 (Fla. 4th DCA 2004) (applying the "appropriate rule" that the one who should lose on the issue of an agreement to arbitrate is the one who failed to carry its burden of proving an acceptance of arbitration as a contractual remedy" (citing Shearson, Lehman, Hutton, Inc. v. Lifshutz, 595 So. 2d 996, 997 (Fla. 4th DCA 1992) (holding proponent of arbitration has burden of establishing an enforceable written agreement to arbitrate))).

Moreover, Appellant's class action complaint rests on a discrete transaction, a transaction that ended with an invoice issued by Appellees and paid by Appellant in the latter months of 2010—an invoice that did not mention arbitration. Appellees assert that the 2012 "Terms and Conditions" can reach back and capture the 2010

8

transaction and connect it to the later arbitration clause because of the purported continuing relationship between the parties and based on the fact that Appellant did not apprise Appellees of its intent to "opt out" of the 2012 arbitration provision. We reject that assertion and hold instead that absent any assent on Appellant's part to arbitrate the 2010 dispute, there can be no legal grounds to compel arbitration in this case. The following case law informs our decision.

In CarePlus Health Plans, Inc. v. Interamerican Medical Center Group, LLC, 124 So. 3d 968 (Fla. 3d DCA 2013), the Third District Court of Appeal addressed the question of whether an arbitration clause in a 2010 agreement between Interamerican and another healthcare company—of which CarePlus was an affiliate—was sufficient to compel arbitration of a dispute between Interamerican and CarePlus based on a 2004 agreement that did not contain an arbitration clause. The Third District held that the 2010 agreement was not sufficient to require arbitration. It reasoned that "[t]he absence of any identifiable nexus or significant relationship between the 2010 Agreement and the claims arising out of the 2004 Agreement is fatal to the position taken by CarePlus, and the trial court properly denied the motion to compel arbitration." Id. at 973. In so holding, the Third District relied on the second prong of the Seifert test—whether an arbitrable issue exists. It emphasized that portion of the Seifert decision stating that to satisfy the second prong, "there must exist a significant relationship between the claim and the

9

agreement containing the arbitration clause." Id. at 972 (citing Seifert, 750 So. 2d at 637-38). Accord Jackson v. Shakespeare Found., Inc., 108 So. 3d 587, 593 (Fla. 2013).

Although resolution of the issue before us primarily rests on the first prong of the Seifert test—whether a valid written agreement to arbitrate was shown to exist— we find it compelling that the Third District held that under the terms of an earlier agreement—separate and apart from the later agreement—there was no intent by the parties to arbitrate disputes under the earlier agreement. See also Citigroup, Inc. v. Boles, 914 So. 2d 23 (Fla. 4th DCA 2005) (citing Seifert, and holding that the arbitration clause between the parties did not require arbitration because "the complaint did not involve or refer to the agreement, and the agreement is not related in any way to the allegedly tortious investment advice"). Here, the "Terms and Conditions" document was mailed to Appellant two years after the 2010 receipt of the invoice for the rental of Appellees' propane tank. Consequently, by analogy, there is no "nexus" between the 2010 invoiced transaction—the subject of the putative class action lawsuit—and the 2012 "Terms and Conditions." Correspondingly, we find there was no assent to arbitrate disputes arising from the 2010 invoice due to the lack of any arbitration language connected to that invoice.

In reaching our decision, we find opinions from the Eighth and Eleventh Circuit Courts of Appeals to be particularly persuasive. In Gedimex, S.A. v. Nidera,

10

<u>Inc.</u>, 290 Fed. App'x 311 (11th Cir. 2008), Nidera appealed the district court's order denying its motion to dismiss or stay proceedings to allow arbitration. Between 2002 and 2007, Gedimex bought approximately fifty large shipments of bulk rice from Nidera. Each shipment was governed by an identical written standard form contract. Those contracts each contained a clause mandating the arbitration of disputes. Four months after the first rice purchase, Nidera and Gedimex entered into a separate oral contract in which Nidera agreed to supply Gedimex with empty bags at cost to facilitate shipment of the rice. That oral contract did not include an agreement to arbitrate disputes arising out of it.

In a subsequent breach of contract action brought by Gedimex, in which it claimed Nidera had overcharged it for the bags, Nidera moved to dismiss or stay the case on the ground that the subject matter of the dispute was covered by the earlier arbitration clause found in the rice-purchase contracts. While acknowledging "the strong federal policy in favor of arbitration," <u>id.</u> at 312, the Eleventh Circuit stated that it would "not compel parties to arbitrate a dispute where the parties have not agreed to do so." <u>Id.</u> Despite giving the phrase "arising out of" in an arbitration clause a broad reading, the Eleventh Circuit emphasized that "'[d]isputes that are not related—with at least some directness—to performance of duties specified by the contract do not count as disputes "arising out of" the contract, and are not covered by the standard arbitration clause . . . .'" <u>Id.</u> (quoting <u>Telecom Italia, SpA v.</u>

11

Wholesale Telecom Corp., 248 F.3d 1109, 1116 (11th Cir. 2001)). Accordingly, it held that "the arbitration clauses in the standard form rice contracts d[id] not encompass Gedimex's claims relating to the separate oral agreement to supply empty bags at cost," since "[e]ach of those arbitration clauses was explicit that it covered only disputes arising out of that particular contract." Id. Therefore, it determined that "[t]he dispute Nidera seeks to arbitrate is not 'a fairly direct result of the performance' of any of the duties set forth in the rice purchase contracts," and thus, was not subject to arbitration. Id. (citing Telecom Italia, 248 F.3d at 1116).

More to the point is the Eighth Circuit Court of Appeals' decision in Dakota Foundry, Inc. v. Tromley Industrial Holdings, Inc., 737 F.3d 492 (8th Cir. 2013). Dakota Foundry was an iron foundry located in Webster, South Dakota, and Tromley Industrial Holdings was an Oregon business that sold foundry equipment and was the parent company of Kloster Foundry Products. The dispute centered on certain equipment Dakota purchased from Kloster. The practice of Kloster was to collect information from potential customers and then prepare an initial quote on its stationery, the reverse side of which included the "Standard Terms and Conditions of Sale." Id. at 493-94. The "Standard Terms and Conditions of Sale" contained a binding arbitration clause. After preparing the initial quote, Kloster would make additional "working copies" of the quote, which did not contain the "Standard Terms

12

and Conditions of Sale" because only the front of the original quote was copied. Kloster would then send the working quote to the potential customer.  Id. at 494.

In this way, in December 2009, Kloster delivered the first set of price quotes, i.e., the "working copies," to Dakota.  Although the quotes contained a document with a "NOTES" section directing Dakota to pay particular attention to the "Standard Terms and Conditions of Sale," which, it was emphasized, were "'an integral part of this quotation,'" no "Standard Terms and Conditions of Sale" were attached to the quotes.  On February 24, 2010, Dakota issued a purchase order to Tromley to cover the December 2009 quotes.  Between February 2010 and April 2010, Tromley and Dakota exchanged several invoices, none of which contained the "Standard Terms and Conditions of Sale."  On April 19, 2010, Tromley issued another quote, which stated it was a "'revised quotation'" and combined the December 2009 quotes "'and all subsequent changes made during our meetings into one, cohesive system quote.'"  Id.  This quote contained the same "NOTES" advising Dakota to "'[p]lease pay particular attention to the attached copy of our Standard Terms and Conditions of Sale which are an integral part of this quotation.'"  Id.  Both parties agreed they had never discussed the "Standard Terms and Conditions of Sale."

In June 2010, Dakota received an email containing an addendum outlining specification changes, attached to which was a document of binding "Standard Terms and Conditions" from two other of Tromley's divisions—sister companies to

13

Kloster, but with which Dakota had never corresponded. Those terms and conditions were identical to Tromley's "Standard Terms and Conditions of Sale," and, accordingly, contained an arbitration clause; but the officer at Dakota did not read them because he did not believe they were meant to apply to the original agreement. Id. Dakota agreed to the changes. Later, it filed a lawsuit against Tromley after becoming dissatisfied with Kloster's equipment. Tromley answered, raising a defense that there was a binding arbitration clause based on the "Standard Terms and Conditions of Sale." Accordingly, it initiated an arbitration proceeding in Oregon and filed a motion to compel arbitration. Because there were disputed issues of fact, an evidentiary hearing was held and, ultimately, the district court denied the motion.

The Eighth Circuit affirmed the district court's decision, announcing that the "primary inquiry [was] whether Tromley's Standard Terms and Conditions of Sale which were referenced but not included in the December 2009 and April 2010 price quotes were incorporated into the agreement between Tromley and Dakota." Id. Citing Mitsubishi Motors, it acknowledged, "'the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.'" Id. (quoting Mitsubishi Motors, 473 U.S. at 626). It went on to hold that "'if the parties [did] not agree[] to arbitrate, the courts have no authority to mandate that they do so.'" Id.

14

Applying South Dakota contract law, which is in all relevant respects the same as that of Florida, the Eighth Circuit emphasized that there must be mutual assent on all essential terms of the contract, and observed that Tromley bore the burden of proving that "its Standard Terms and Conditions of Sale were part of the parties' agreement." Id. Significantly, it found:

> The December 2009 and April 2010 quotes did not include a copy of the Standard Terms and Conditions of Sale even though the NOTES section referred to "the attached copy of our Standard Terms and Conditions of Sale." The quotes did have a document entitled "STANDARD PAYMENT TERMS" attached, though it did not include an arbitration provision.

Id. at 496. It further found: "Here, Dakota did not have a reasonable opportunity to reject the arbitration provision because it was unaware of the clause." Id. It then went on to assert that "it cannot be said Dakota was on notice of a document it did not already have in its possession. Because the arbitration provision was not readily available and because Dakota did not have a reasonable opportunity to reject it, Tromley cannot establish the necessary consent to bind Dakota to that provision." Id. The Eighth Circuit concluded: "[I]t was reasonable for Dakota to ignore the attached Standard Terms and Conditions of Sale which appeared tailored to two divisions with which it had no business. Therefore, applying the same analysis . . . we cannot say the parties mutually assented to modify their agreement to include the arbitration provision." Id. at 497.

15

In sum, the Eleventh Circuit's analysis in Gedimex is noteworthy because it confirms Appellant's argument that Appellees' 2012 "Terms and Conditions" should not be applied retroactively to bind Appellant when the terms were not known by it at the time of its receipt of the 2010 invoice, an invoice that forms the basis of the class action lawsuit. However, we find the Eighth Circuit's logic in Dakota Foundry to be even more compelling. As was true in that case, here, the 2010 invoice did not have the "Terms and Conditions" appended to it. Consequently, Appellant did not assent to them by leasing the propane tank. Moreover, Appellant's mere receipt of the "Terms and Conditions" in 2012 did not evidence a mutual intent that they be applied retroactively to the 2010 invoice. See also Holick v. Cellular Sales of N.Y., LLC, 802 F.3d 391 (2d Cir. 2015) (holding claims did not fall within scope of arbitration clause because the parties did not intend the clause to be retroactive); Nguyen v. Barnes & Noble Inc., 763 F.3d 1171 (9th Cir. 2014) (denying motion to compel arbitration and holding the proximity or conspicuousness of the hyperlink to the terms and conditions containing the arbitration clause, alone, was not enough to give rise to constructive notice of those terms); Dasher v. RBC Bank (USA), 745 F.3d 1111 (11th Cir. 2014) (holding the district court did not err in denying the bank's motion to arbitrate, despite the fact that an earlier version of the parties' agreement contained an arbitration clause, because that agreement was entirely superseded by a newer agreement, which was silent on arbitration, and

16

further observing that when, under state law, parties agree to supersede an old contract by forming a new one, basic contract principles require the court to look only to the new agreement for evidence of the parties' intent, which, in the case before it, provided no evidence that the parties agreed to be bound to arbitrate their disputes); Spahr v. Secco, 330 F.3d 1266 (10th Cir. 2003) (rejecting argument that because subsequent customer agreements, each of which contained an arbitration agreement identical to the one signed by the customer when he opened his account, constituted an independent obligation for the customer to arbitrate the instant dispute, where the later customer agreements did not cover the present dispute); Int'l Ambassador Programs, Inc. v. Archexpo, 68 F.3d 337 (9th Cir. 1995) (holding arbitration clause in prior agreement did not apply to subsequent agreement); cf. Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 723 (9th Cir. 1999) (rejecting Simula's argument that its Lanham Act claims were not arbitrable because they were separate tort claims relating to conduct that occurred prior to the date on which the parties entered into the arbitration clause and, therefore, they were governed by the parties' previous agreements, holding instead that "any obligation of Autoliv under the 1993 nondisclosure agreement and the January 1994 letter of intent was incorporated into the 1995 Agreement under the merger clause, and is subject to the arbitration clause").

Appellees rely on two federal district court decisions that we conclude are readily distinguishable from the circumstances of the instant case. The first of those is Sanders v. Comcast Cable Holdings, LLC, No. 3:07-cv-918-J-33HTS (M.D. Fla. Jan. 14, 2008) [2008 WL 150479]. In Sanders, the Plaintiffs filed a federal class action lawsuit alleging Comcast's "On Demand" cable feature was defective. Comcast filed a motion to compel arbitration. The Plaintiffs asserted they should not be compelled to arbitrate because they never signed an arbitration agreement and never consented to submit their disputes to arbitration. Comcast argued it mailed a "Notice from Comcast Regarding Arbitration" to each Plaintiff; that the Notice bound the Plaintiffs to arbitration; and that none of the Plaintiffs had opted out of the terms of the Notice. Id. at *1. Although the federal district court determined it was "essential that this Court first determine whether the parties agreed to arbitrate the dispute at hand," id. at *3, it acknowledged it must also determine from the record "whether Plaintiffs can be bound to arbitrate by virtue of their failure to opt out of the terms of the Arbitration Notice *and by virtue of their continued use of Comcast's services*." Id. (emphasis added). The district court pointed out that no signature was needed to meet the Federal Arbitration Act's written agreement requirement. Furthermore, in response to the Plaintiffs' contention that they had not received the Notice, it relied on the fact that "'the common law has long recognized a rebuttable presumption that an item properly mailed was received by the

18

addressee.'" Id. at *6 (quoting Barnett v. Okeechobee Hosp., 283 F.3d 1232, 1239 (11th Cir. 2002)). Lastly, the district court considered that the Plaintiffs' continued use of Comcast's services "militated in favor of finding that the Plaintiffs consented to the terms and conditions" as stated in the arbitration clause. Id. (citing Rivera v. AT & T Corp., 420 F. Supp. 2d 1312, 1320 (S.D. Fla. 2006)).

In contrast to the circumstances and issues addressed in Sanders, here, the issue does not turn on Appellant's alleged continuous business relationship with Appellees or whether it assented to the subsequent arbitration clause by not opting out. The distinction lies in the fact that the class action lawsuit arises from a singular transaction that took place two years before Appellees mailed out their "Terms and Conditions" document. As the Eleventh Circuit Court of Appeals pointed out in Chastain v. The Robinson-Humphrey Co., 957 F.2d 851 (11th Cir. 1992), "the calculus changes when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration. In such a case, that party is challenging the very existence of any agreement, *including the existence of an agreement to arbitrate.*" Id. at 854 (emphasis in original). Indeed, the very existence of an agreement to arbitrate is what is at issue here. Sanders does not change our conclusion.

For similar reasons, the decision in Dorward v. Macy's Inc., No. 2:10–cv– 669–FtM–29DNF (M.D. Fla. July 20, 2011) [2011 WL 2893118], is equally

19

inapposite. Similar to the situation in <u>Sanders</u>, <u>Dorward</u> involved an arbitration clause that viewed the employees' continued employment with the company as an identifiable means of assent under the terms of the arbitration clause. The federal district court compelled arbitration because the plaintiff had declined to opt out of the arbitration clause. It reasoned that "[b]y declining to opt out in accordance with the terms of the offer, plaintiff accepted defendant's offer to resolve any disputes through arbitration." <u>Id.</u> at **26-27. Again, <u>Dorward</u> does not address the distinctive circumstances presented in the instant case, where Appellant is suing Appellees on the basis of a single contractual transaction that contained *no* arbitration clause to which Appellant could have assented at the time. In the common parlance of blackletter contract law, there was no "meeting of the minds" between the parties in 2010 on any terms involving the mandatory arbitration of disputes.

For all of these reasons, we reject Appellees' call for affirmance of the trial court's order dismissing Appellant's complaint with prejudice and granting Appellees' motion to compel arbitration. Instead, we hold there was no showing that Appellant and Appellees entered into a valid written agreement in 2010 to arbitrate the dispute addressed in Appellant's amended complaint. Accordingly, we reverse the order on appeal and remand the case to the trial court for further proceedings consistent with this opinion.

20

REVERSED and REMANDED.

B.L. THOMAS and WINOKUR, JJ., CONCUR.