[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-14764
Non-Argument Calendar

_____

D.C. Docket No. 1:19-cv-24235-JB

THE TAYLOR GROUP, INC.,
a Mississippi corporation,
TAYLOR MACHINE WORKS, INC.,
a Mississippi corporation,
SUDDEN SERVICE, INC.,
a Mississippi corporation,

Plaintiffs-Appellees,

versus

INDUSTRIAL DISTRIBUTORS INTERNATIONAL CO.,
a Florida corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 8, 2021)

Before NEWSOM, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Industrial Distributors International Co. appeals the district court's order denying its motion to compel Taylor Group[1] to arbitrate its trademark infringement claims. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case is about three separate agreements: a distribution agreement, in which Taylor Group granted Taylor Machine Works International, Inc.[2] the right to distribute its products overseas; a marketing agreement, in which Taylor International granted International Distributors the right to market its products in the Dominican Republic; and an asset purchase agreement, in which Taylor Group purchased the overseas distribution rights it had granted to Taylor International. International Distributors contends Taylor Group is bound by the marketing

---

[1] We refer to The Taylor Group, Inc., Taylor Machine Works, Inc., and Sudden Service, Inc., as "Taylor Group."

[2] Despite the name, Taylor International was not owned by the Taylor family.

agreement's arbitration clause, even though Taylor Group is not a party to the marketing agreement.

**The Distribution Agreement.**   Taylor Group manufactures forklifts.   In 1991, Taylor Group entered a distribution agreement with Taylor International, granting it "overseas distribution rights to TAYLOR® equipment and parts."   The distribution agreement provided that Taylor International would "be the sole export management organization engaged by" Taylor Group outside the United States and Canada.   The distribution agreement also said it was:

> UNDERSTOOD AND AGREED THAT [TAYLOR] INTERNATIONAL, AS AN INDEPENDENT BUSINESS, [WAS] A SEPARATE LEGAL ENTITY FROM TAYLOR [GROUP], AND THE RELATIONSHIP ESTABLISHED [WAS] THAT OF A BUYER AND SELLER, [TAYLOR] INTERNATIONAL BUYING THE SAID PRODUCTS FROM TAYLOR [GROUP] FOR RESALE TO OTHERS FOR ITS OWN ACCOUNT. [TAYLOR] INTERNATIONAL [WAS] NOT, IN ANY SENSE, AN AGENT OF TAYLOR [GROUP] AND HA[D] NO AUTHORITY TO TRANSACT ANY BUSINESS IN [TAYLOR GROUP'S] NAME OR TO INCUR ANY OBLIGATION OR LIABILITY FOR OR AGAINST TAYLOR [GROUP], OR TO BIND TAYLOR [GROUP] IN ANY MANNER WHATSOEVER.

 "The Agreement [was] not assignable in whole or in part by either party," and it was "agreed that the right extended by TAYLOR [GROUP] to sell TAYLOR products [was] not an asset of [TAYLOR] INTERNATIONAL, but belong[ed] at all times to TAYLOR [GROUP], subject to the terms of th[e] Agreement."

After Taylor Group entered into the distribution agreement with Taylor International, International Distributors' president, Paolo Amore, reached out to Taylor Group to purchase parts for customers in the Dominican Republic who were having trouble getting replacement parts for their Taylor forklifts. Taylor Group referred Amore to Taylor International, and International Distributors continued to purchase Taylor parts from Taylor International for a couple of years. Taylor International's president, Doug Hulse, invited Amore to tour the Taylor factory and meet the Taylor family. Amore accepted the invitation and Hulse introduced Amore to the Taylors.

**The Marketing Agreement.** In 1999, Taylor International entered into a "marketing agreement" with International Distributors. The marketing agreement had an arbitration clause that provided: "In the event of a dispute between the Company and the Agent, the International Chamber of Commerce shall be the arbitrating body." The marketing agreement provided that Taylor International "grant[ed] to [International Distributors] the right to market the equipment" in the Dominican Republic. Taylor International later added Colombia to International Distributors' territories.

International Distributors agreed that it would not sell or recommend any products that were not "genuine or new [Taylor International] products manufactured by or for [Taylor International]." The marketing agreement also

4

provided that International Distributors would service Taylor International's "products already in operation" in International Distributors' territories. International Distributors agreed that it would not "use the name '[Taylor International]' or any [Taylor International] trademark or trade name" except as "approved in writing" by Taylor International. The parties agreed that the marketing agreement could not be assigned "in whole or in part" and that it could be terminated by either party on ninety days' written notice.

In May 2018, Taylor International sent a letter to International Distributors terminating the marketing agreement "effective 90 calendar days" from the date of the letter. In the letter, Taylor International said that International Distributors could still order parts "under the current terms and conditions" until the ninety-day termination period ended. That same day, Hulse emailed Taylor Group and said that Taylor International had "issued [International Distributors] the 90 day notice of cancellation." Hulse noted that the marketing agreement allowed "cancellation for any reason by either side," but he explained that the termination was for many reasons, including "[c]ustomer complaints," "[p]oor business levels," and a "[l]ack of service support."

**The Asset Purchase Agreement and Trademark Dispute.** In early September 2019, Taylor Group purchased some of Taylor International's assets, including the overseas distribution rights covered by the 1991 distribution

agreement. After it bought back the international distribution rights, Taylor Group learned that International Distributors was using Taylor brand trademarks on its website to represent itself as an authorized dealer of Taylor brand equipment and parts, so Taylor Group sued International Distributors for trademark infringement and unfair competition. International Distributors filed a motion to compel arbitration based on the arbitration clause in the marketing agreement.

International Distributors argued that the International Chamber of Commerce panel should decide "in the first instance" whether Taylor Group—which did not sign the marketing agreement—was bound to arbitrate under the agreement. But if the arbitration question was for the district court, International Distributors argued that Taylor Group was "bound to arbitrate under several theories," including that: (1) Taylor Group assumed the marketing agreement when it purchased Taylor International's assets; (2) Taylor International was acting as Taylor Group's agent when Taylor International entered the marketing agreement with International Distributors; and (3) Taylor Group should be estopped from opposing arbitration because of its distribution agreement with Taylor International and the fact that Taylor Group benefitted from the marketing agreement.

Taylor Group opposed arbitration because, as a non-party to the marketing agreement, it could not be compelled to arbitrate. Taylor Group argued that: (1) it did not assume the marketing agreement, since Taylor International terminated the

6

marketing agreement before Taylor Group purchased its assets; (2) Taylor International did not act as Taylor Group's agent, since it had no authority to bind Taylor Group to the marketing agreement; and (3) Taylor Group was not equitably estopped from opposing arbitration, since Taylor International was not Taylor Group's "affiliate," Taylor Group did not knowingly receive any direct benefits from the marketing agreement, and International Distributors could not compel arbitration by basing its defense on the marketing agreement.

After reviewing the briefing and affidavits, and holding a hearing, the district court denied International Distributors' motion to compel arbitration.[3] The district court concluded that it had the authority to answer the arbitrability question because "the question of whether a non-party is bound by an arbitration clause [was] within the sound discretion of the court and not an arbitrator." The district court explained that "[a]lthough an arbitrator may have the authority to decide the scope of the claims of the parties that have agreed to proceed to arbitration, that cannot encompass the issue of whether its jurisdiction applies to non-signatories" because, by definition, non-signatories have not agreed to the arbitration clause's language.

Having determined that it was the one that had to decide, the district court concluded that Taylor Group could not be compelled to arbitrate under any of

---

[3] After the parties consented to proceed before the magistrate judge, the district court referred the case "entirely" to the magistrate judge.

International Distributors' theories.  First, the district court found that Taylor Group did not assume the marketing agreement when it purchased some of Taylor International's assets.  Taylor Group, the district court explained, did not assume any of Taylor International's liabilities and only purchased specific assets, which did not include the marketing agreement.  The failure to include the marketing agreement "[did] not appear to be an oversight" because "the record show[ed] that [Taylor] International terminated the agreement," and advised Taylor Group of the termination, a year before the asset purchase agreement.

Second, the district court found that Taylor International did not act as Taylor Group's agent.  The district court explained that the distribution agreement "plainly undermine[d] the argument that there was an agency relationship between [Taylor] International and [Taylor Group]" because it "specifically disclaim[ed] any agency relationship."  The record also "show[ed] that Taylor [Group] did not exercise control over [Taylor] International," as was required for an agency relationship.

Third, the district court also found that Taylor Group was not estopped from opposing arbitration of its trademark claims.  International Distributors advanced three "species" of estoppel, arguing that Taylor Group was estopped because: (1) Taylor International was its "affiliate"; (2) International Distributors' defense to Taylor Group's trademark claims was based on the marketing agreement; and (3) Taylor Group accepted benefits from the marketing agreement.  The district court

8

rejected the argument that Taylor International was Taylor Group's "affiliate" because "the 'heart' of the definition of affiliate" is control and Taylor Group "did not exercise control over [Taylor] International." Next, the district court rejected International Distributors' argument that because its defense to Taylor Group's claims was based on the marketing agreement, Taylor Group was estopped from opposing arbitration of its claims. That argument, the district court explained, was not supported by any authority and the theory of estoppel did not apply because Taylor Group was seeking to enforce intellectual property rights that were unrelated to the marketing agreement with the arbitration clause. Finally, the district court rejected International Distributors' argument that Taylor Group knowingly received direct benefits from the marketing agreement because the benefit Taylor Group received "was the sale of Taylor [Group] products in the Dominican Republic and Colombia" and "sales alone are not a direct benefit."

International Distributors appeals the district court's order denying its motion to compel arbitration.

## STANDARD OF REVIEW

"We review de novo a district court's denial of a motion to compel arbitration," Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc., 845 F.3d 1351, 1354 (11th Cir. 2017), "accept[ing] the district court's findings of fact that are not clearly erroneous," Multi-Fin. Sec. Corp. v. King, 386 F.3d 1364, 1366

9

(11th Cir. 2004). "Contract interpretation is a question of law and is subject to de novo review." Am. Cas. Co. of Reading, Pa. v. Etowah Bank, 288 F.3d 1282, 1285 (11th Cir. 2002).

## DISCUSSION

International Distributors argues that the district court erred by deciding the question of arbitrability because that question was for the International Chamber of Commerce panel, not the district court. Even if the question was properly before the district court, International Distributors contends that the district court erred in concluding that Taylor Group could not be compelled to arbitrate under the marketing agreement's arbitration clause. International Distributors argues that the district court erred in concluding that: 1) Taylor Group was not estopped from opposing arbitration; 2) Taylor Group was not a third-party beneficiary to the contract; 3) Taylor International did not act as Taylor Group's agent; and 4) Taylor Group did not assume the contract when it purchased Taylor International's assets. We address these arguments below.

*The District Court Properly Decided the Question of Arbitrability*

International Distributors argues that the district court should not have decided the question of arbitrability because International Distributors and Taylor International agreed that the International Chamber of Commerce panel would have the power to determine its jurisdiction. But International Distributors' motion to

compel arbitration asked the district court "to determine if there [was] a basis for binding Taylor Group or its subsidiaries to arbitration." That is what the district court did. Only because the district court's answer was "no" does International Distributors now argue that the district court should not have decided the question. Nevertheless, International Distributors is wrong.

There is no evidence that Taylor Group, a non-party to the marketing agreement, agreed to submit the question of arbitrability to arbitration. In First Options of Chicago, Inc. v. Kaplan, the Supreme Court made clear that if "the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently." 514 U.S. 938, 943 (1995). International Distributors concedes that only it "and [Taylor] International agreed that the [International Chamber of Commerce panel would have] the power to determine its jurisdiction." That does not include Taylor Group and we cannot "assume . . . parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." Id. at 944 (quotation omitted; alterations adopted). The marketing agreement's arbitration clause says that "[i]n the event of a dispute between the Company and the Agent, the International Chamber of Commerce shall be the arbitrating body." That is all. There is no mention of Taylor Group or any non-party. Therefore, we cannot say that Taylor Group "clear[ly] and

11

unmistakabl[y]" agreed to arbitrate this threshold question. Absent "clear and unmistakable evidence" to the contrary, "the question whether the parties have a valid arbitration agreement at all is for the court, not the arbitrator, to decide." See Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1332 (11th Cir. 2005) (quotation omitted).

International Distributors suggests that we should err on the side of arbitration because Taylor Group would suffer no "irreparable harm" by being compelled to arbitrate because "Taylor [Group] can simply move to vacate any award against it if the arbitrators exceed their powers." But even-if-its-wrong-the-courts-can-vacate-it is not the test we apply and the Supreme Court has explained that, although a "party . . . can ask a court to review [an] arbitrator's decision," courts "will set that decision aside only in very unusual circumstances." Kaplan, 514 U.S. at 942. For this reason, "who—court or arbitrator—has the primary authority to decide whether a party has agreed to arbitrate can make a critical difference to a party resisting arbitration." Id. That is why we require "clear and unmistakable evidence" that a party has agreed to submit the question of arbitrability to arbitration, and because International Distributors has shown no evidence that non-party Taylor Group did so, the district court did not err by deciding the question of arbitrability. See Chastain v. Robinson-Humphrey Co., Inc., 957 F.2d 851, 854 (11th Cir. 1992) ("If a party has not signed an agreement containing arbitration language, such a party may not have agreed to

12

submit grievances to arbitration at all.    Therefore, before sending any such grievances to arbitration, the district court itself must first decide whether or not the non-signing party can nonetheless be bound by the contractual language.").

*Taylor Group Cannot be Compelled to Arbitrate its Claims*

The Federal Arbitration Act "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." Hearn v. Comcast Cable Commc'ns, LLC, 992 F.3d 1209, 1213 (11th Cir. 2021) (quotation omitted); see also 9 U.S.C. § 2 ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").  There is no dispute that Taylor International and International Distributors would be required to arbitrate their disputes under the marketing agreement's arbitration clause.  The question here is whether Taylor Group, a non-party to the marketing agreement, is bound by that agreement to arbitrate its trademark infringement claims.

State law "governs the issue whether a contract may be enforced by or against a nonparty." Kong v. Allied Prof'l Ins. Co., 750 F.3d 1295, 1302 (11th Cir. 2014) (citations omitted); see also Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630 (2009) (The Federal Arbitration Act does not "alter background principles of state

13

contract law regarding the scope of agreements (including the question of who is bound by them).").  Although the marketing agreement selects New Jersey law, the parties agreed at the hearing "that there was no substantive difference between the law of Florida and New Jersey."  In its motion to compel, International Distributors primarily relied on Florida law and the district court did the same.

Under Florida law, generally a "party who has not agreed to be bound by an arbitration agreement cannot be compelled to arbitrate."  Massa v. Michael Ridard Hosp. LLC, 306 So. 3d 1106, 1109 (Fla. Dist. Ct. App. 2020).  But non-parties can be "bound to arbitration agreements under the theories of (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego; and (5) estoppel." Id.  A non-party to an arbitration agreement may also be bound to arbitrate if the non-party "has received something more than an incidental or consequential benefit of the contract, or if the [non-party] is specifically the intended third-party beneficiary of the contract."  Germann v. Age Inst. of Fla., Inc., 912 So. 2d 590, 592 (Fla. Dist. Ct. App. 2005) (citations omitted).  International Distributors raises four of these theories:  (1) estoppel; (2) third-party beneficiary; (3) agency; and (4) assumption.  All are without merit.

### 1.  Taylor Group Cannot be Compelled to Arbitrate by Estoppel.

International Distributors argues that Taylor Group is estopped from "asserting lack of signature to avoid arbitration" because Taylor Group's "claim

14

[was] based in some way on the contract that contained the arbitration clause" and Taylor Group "directly benefitted from the contract."

> a. Taylor Group's Trademark Claims are not Based on the Marketing Agreement.

Taylor Group's claims are not based on the marketing agreement. International Distributors concedes this point in its brief: "To be sure, [Taylor Group's] trademark claims do not seek to enforce the [Marketing] Agreement." Instead, International Distributors contends that Taylor Group must arbitrate its claims because of "the fact that the [Marketing] Agreement serves as a defense to the trademark claims." International Distributors cites no case for the proposition that a non-party to an agreement whose claims are not based on the agreement may nevertheless be estopped from opposing arbitration of its claims because a defendant's theory of defense invokes the agreement. The cases it does cite stand only for the uncontroversial point that if a plaintiff's claims are based on the contract containing the arbitration clause, it cannot oppose arbitration. See, e.g., McBro Planning & Dev. Co. v. Triangle Elec. Const. Co., Inc., 741 F.2d 342, 344 (11th Cir. 1984) (holding that plaintiff was estopped from opposing arbitration because its claims were "intimately founded in and intertwined with the underlying contract obligations"); Jackson v. Shakespeare Found., Inc., 108 So. 3d 587, 595 (Fla. 2013) (holding that plaintiff must arbitrate its claim because the claim was "inextricably intertwined with both the transaction from which the contract arose and the contract

15

itself—the reliance element of the claim emanate[d] from the transaction from which the contract arose, and the damages element of the claim [arose] from the execution and existence of the contract itself").

International Distributors contends that by raising the marketing agreement as a defense to Taylor Group's trademark infringement claims, it meets the "significant relationship" test. In Jackson, the Florida Supreme Court held that a plaintiff must arbitrate her claim when her claim has a "significant relationship" to the contract. 108 So. 3d at 593. "[A] significant relationship is described to exist between an arbitration provision and a claim if there is a 'contractual nexus' between the claim and the contract." Id. "A contractual nexus exists between a claim and a contract if the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract." Id.

Here, the marketing agreement is wholly unrelated to Taylor Group's trademark claims based on conduct beginning in September 2019—over a year after the marketing agreement was terminated. As Taylor Group points out, "the fact that [Taylor International] may have at one time authorized [International Distributors] to sell TAYLOR® equipment and parts in Colombia and the Dominican Republic provides no defense to [International Distributors'] ongoing use of the TAYLOR® Marks—in Miami and elsewhere—long after termination of the Marketing Agreement." Because the marketing agreement was terminated long before Taylor

16

Group alleges that International Distributors infringed trademarks, Taylor Group's trademark "claims present no circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract," and, thus, there is no "significant relationship" between the marketing agreement and Taylor Group's trademark claims.

International Distributors disputes that the marketing agreement was ever terminated, but the district court found that it was and that finding is supported by substantial evidence in the record.[4] See Thelma C. Raley, Inc. v. Kleppe, 867 F.2d 1326, 1328 (11th Cir. 1989) ("a finding of fact [is not] clearly erroneous if the record [contains] substantial evidence to support it"). In its May 2018 letter, Taylor International told International Distributors that "any / all agreements that [were] currently in place between [Taylor International] and [International Distributors] [were] terminated effective 90 calendar days" from the date of the letter, which would be August 14, 2018. That same day, Hulse told Taylor Group that Taylor

---

[4] International Distributors argues that the district court erred because it "resolv[ed] factual disputes" on the affidavits without holding an evidentiary hearing. But International Distributors does not explain why an evidentiary hearing was necessary. A district court may resolve a motion without live testimony. See Fed. R. Civ. P. 43 ("When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions."). Even so, the district court asked the parties whether there was a "need for an evidentiary hearing on the motion to compel." International Distributors said that the district court could resolve the motion by "rely[ing] on the affidavits" alone. That is what the district court did. The failure to hold an evidentiary hearing—even if it was error—was invited by International Distributors and, thus, we cannot address the issue. See Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1231 (11th Cir. 2012) ("A party that invites an error cannot complain when its invitation is accepted.").

International had "issued [International Distributors] the 90 day notice of cancellation," and though Hulse noted that the marketing agreement allowed "cancellation for any reason by either side," he explained that the termination was for many reasons, including "[c]ustomer complaints," "[p]oor business levels," and a "[l]ack of service support."

According to International Distributors, a series of emails between Amore and Hulse show that Taylor International "withdrew the termination notice before it became effective." But those emails confirm the termination rather than undermine it. On August 13, 2018—one day before the ninety-day termination period ended—Hulse emailed Amore and said it was "sad that it took a letter of cancellation for [Amore] to once again surface." Hulse offered to buy back International Distributors' trucks and "stock parts." Amore responded that he was "on vacation with [his] family, cruising the outer islands of the Bahamas" and would respond when he returned from vacation. The termination became effective the next day. A week later, Amore responded, disputing Taylor International's reasons for terminating the marketing agreement. Hulse and Amore continued arguing by email for months, both sticking to their positions. International Distributors identified no email from Hulse "withdrawing" the termination of the marking agreement.

Next, International Distributors argues that the marketing agreement could not have been terminated because "that termination would be wrongful." International

Distributors does not explain what was "wrongful" about the termination. To the extent International Distributors disputes Taylor International's reasons for terminating the marketing agreement, those reasons were given only as a courtesy. The marketing agreement allowed for termination by either party "at any time . . . with or without cause."

International Distributors also argues that the marketing agreement could not have been terminated because Taylor International continued to accept and fulfill orders from International Distributors. But those orders were not a continuation of the marketing agreement. While the marketing agreement allowed International Distributors to resell Taylor forklifts and required International Distributors to provide warranty service for those forklifts, after Taylor International sent International Distributors the termination letter, the only business between the two companies was a few parts orders.

The communications between Taylor International and International Distributors confirm that the parts orders were not placed under the marketing agreement. The emails between Amore and Hulse show that International Distributors was trying to be reinstated as an authorized dealer of Taylor forklifts and asked for an in-person meeting. At that meeting, Taylor International maintained the termination of the marketing agreement and explained why it would not reinstate International Distributors. Whatever their new agreement was for parts

19

orders, it did not revive the marketing agreement containing the arbitration clause that International Distributors seeks to use as a defense here.

b. Taylor Group did not Receive Direct Benefits from the Marketing Agreement.

International Distributors argues that Taylor Group should be estopped from opposing arbitration because it "directly benefited" from the marketing agreement by accepting and fulfilling orders and relying on International Distributors to provide warranty service. "[W]here a company knowingly accepted the benefits of an agreement with an arbitration clause, even without signing the agreement, that company may be bound by the arbitration clause." MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001) (quotation marks omitted). But the "benefits must be direct—which is to say, flowing directly from the agreement," not a "benefit derived from an agreement . . . where the nonsignatory exploits the contractual relation[ship] of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." Id.

Taylor Group did not receive direct benefits from the marketing agreement. The record shows that International Distributors placed its orders with Taylor International and then Taylor International ordered the equipment from Taylor Group to resell to International Distributors. At most, Taylor Group made money from the contractual relationship between Taylor International and International Distributors, but simply making money as a result of a contract between other parties

20

is not a "direct benefit" that binds a non-party to the contract.  See, e.g., Morgan Stanley DW Inc. v. Halliday, 873 So. 2d 400, 403 (Fla. Dist. Ct. App. 2004) (holding that a non-signatory trust beneficiary was not bound by an arbitration clause despite the contract generating income that ultimately flowed to the non-signatory).  As for the warranty service International Distributors provided, that was a direct benefit to Taylor International, not Taylor Group.  Under the marketing agreement, the equipment International Distributors agreed to service in the Dominican Republic was "[e]quipment sold or serviced by [Taylor International]," not Taylor Group.  Thus, the "direct benefits" of the marketing agreement flowed to Taylor International, not Taylor Group.

2. Taylor Group was not a Third-Party Beneficiary of the Marketing Agreement.

International Distributors argues that the district court did not address its theory that Taylor Group was a third-party beneficiary of the marketing agreement.  But International Distributors conceded in the district court that "[t]he analysis of whether a non-signatory is a third-party beneficiary to a contract containing an arbitration clause is the same as the analysis applicable to direct benefits estoppel."  Thus, the district court's rejection of International Distributors' direct-benefits estoppel theory also applied to its third-party-beneficiary theory.

Taylor Group was not a third-party beneficiary of the marketing agreement.  "A non-party is the specifically intended beneficiary only if the contract clearly

expresses an intent to primarily and directly benefit the third party or a class of persons to which that person belongs." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 983 (11th Cir. 2005). Here, the marketing agreement expressed the opposite intent. It said that Taylor International and International Distributors were "independent businessmen who ha[d] joined together for their mutual benefit, but only to best realize their individual goals." Taylor Group, as we explained above, did not receive a direct benefit from the contract so it could not be an intended third-party beneficiary. See Germann, 912 So. 2d at 592 (To be bound as a third-party beneficiary, "a nonsignatory to an arbitration agreement" must have "received something more than an incidental or consequential benefit of the contract.").

3. Taylor International did not Sign the Marketing Agreement as Taylor Group's Agent.

International Distributors argues that Taylor Group is bound by the arbitration clause in the marketing agreement because Taylor International entered the marketing agreement as Taylor Group's agent. "The essential elements necessary to establish an actual agency relationship are (1) acknowledgment by the principal that the agent will act for him, (2) acceptance by the agent of the undertaking, and (3) control by the principal over the agent's actions." Roman v. Bogle, 113 So. 3d 1011, 1016 (Fla. Dist. Ct. App. 2013).

Taylor Group explicitly rejected an agency relationship with Taylor International in the distribution agreement. The distribution agreement provided that

22

"Taylor International, as an independent business, [was] a separate legal entity from Taylor [Group], and the relationship established [was] that of a buyer and seller," with "Taylor International buying the said products from Taylor [Group] for resale to others for its own account." The distribution agreement also made clear that "Taylor International [was] not, in any sense, an agent of Taylor [Group] and ha[d] no authority to transact any business in [Taylor Group's] name or to incur any obligation or liability for or against Taylor [Group], or to bind Taylor [Group] in any manner whatsoever." Taylor Group's "considerable efforts" to avoid an agency relationship shows that Taylor Group did not acknowledge that Taylor International would act on its behalf. Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp., Inc., 575 F.3d 1180, 1189 (11th Cir. 2009) ("[C]onsiderable efforts to avoid an agency designation is palpable evidence" that a party "did not intend to consent or acquiesce to an agency relationship.").

Taylor Group also had no control over Taylor International's actions. International Distributors argues that "[t]he degree of control by Taylor [Group] [was] high" because Taylor Group "ha[d] the absolute right to accept or reject orders." But Taylor Group's ability to accept or reject an order from Taylor International does not show that Taylor Group had "control" over Taylor International. The ability to accept or reject an order from a customer shows that Taylor Group had control over its own manufacturing capacity, not its customers.

23

Without any evidence that Taylor Group had the power to control Taylor International's business—beyond rejecting an order—International Distributors cannot show control and, thus, cannot show an actual agency relationship. Virgilio v. Ryland Group, Inc., 680 F.3d 1329, 1336 (11th Cir. 2012) ("An essential element of the existence of an actual agency relationship is control by the principal over the actions of the agent." (quotation omitted)).[5]

International Distributors contends that "[e]ven if Taylor International was not [Taylor Group's] [a]gent in fact, Taylor [Group] is nonetheless estopped to deny that the [marketing] [a]greement was executed on behalf of Taylor [Group]" under a theory of apparent agency. "Apparent agency exists only if" there is: "1) a representation by the purported principal; 2) reliance on that representation by a third party; and 3) a change in position by the third party in reliance on the representation." Ocana v. Ford Motor Co., 992 So. 2d 319, 326 (Fla. Dist. Ct. App. 2008). "'Apparent authority' does not arise from the subjective understanding of the person dealing with the purported agent, nor from appearances created by the

---

[5] International Distributors argues that Taylor International made Taylor Group a party to the marketing agreement because "the Company" in the agreement referred to Taylor Group, not Taylor International. This argument is not supported by the contract language. The marketing agreement never mentions Taylor Group, only Taylor International and International Distributors. The "products" that International Distributors agreed to resell in the Dominican Republic are "[Taylor International] products." The equipment International Distributors agreed to service was "[e]quipment sold or serviced by [Taylor International]." And the arbitration clause, which International Distributors concedes was between International Distributors and Taylor International, said it was between "the Company and the Agent." In short, "the Company" was Taylor International, not Taylor Group in disguise.

24

purported agent himself; instead, 'apparent authority' exists only where the principal creates the appearance of an agency relationship." Id.

International Distributors argues that Taylor Group represented Taylor International as its "international division" and that International Distributors relied on that representation when it entered into the marketing agreement. But International Distributors couldn't have relied on Taylor Group's representation. The marketing agreement between Taylor International and International Distributors said that its parties were acting as "independent businessmen . . . only to best realize their individual goals." In other words, even if Taylor Group made some representation of Taylor International's "apparent authority," International Distributors agreed that it understood Taylor International was not acting with that authority, but only on its own behalf when it entered into the marketing agreement.

4.  Taylor Group did not Assume the Marketing Agreement.

International Distributors finally argues that Taylor Group was bound by the arbitration clause because it assumed the marketing agreement in its asset purchase agreement with Taylor International. There are several problems with this theory. First, the asset purchase agreement was "limited" to specific assets listed in section 2.1, which did not include the marketing agreement. Second, at the time of the purchase, the marketing agreement was no longer one of Taylor International's assets because it had been terminated and the marketing agreement specifically

25

excluded "any liability or obligation . . . relating to, resulting from, or arising out of, any former operation of [Taylor International] that had been discontinued or disposed of prior to the Closing." Third, even if it was still an asset, the marketing agreement could not have been purchased by Taylor Group because it could not be assigned. The marketing agreement provided that it was "not assignable in whole or in part by either party." Thus, Taylor Group cannot be compelled to arbitrate under a theory of assumption.

## CONCLUSION

International Distributors moved to compel Taylor Group to arbitrate its trademark claims, relying on the arbitration clause in a marketing agreement that Taylor Group did not sign. Taylor Group was not a party to the marketing agreement, its trademark claims were not based on the marketing agreement, it did not receive a direct benefit from the marketing agreement, it was not a third-party beneficiary of the marketing agreement, neither party to the marketing agreement acted as Taylor Group's agent, and Taylor Group never assumed the marketing agreement. Therefore, International Distributors cannot show that Taylor Group was bound to the marketing agreement's arbitration clause. Thus, we affirm the district court's denial of International Distributors' motion to compel arbitration.

**AFFIRMED.**

26